Milo Steven Marsden (Utah State Bar No. 4879)
Maryann Bauhs (Utah State Bar No. 17196)
**DORSEY & WHITNEY LLP**
111 South Main Street, Suite 2100
Salt Lake City, UT  84111
Telephone: (801) 933-7360
Email: marsden.steve@dorsey.com
      bauhs.maryann@dorsey.com

Sharon L. Schneier (*pro hac vice* pending)
Nimra H. Azmi (*pro hac vice* pending)
**DAVIS WRIGHT TREMAINE LLP**
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel:    (212) 489-8230
Email: sharonschneier@dwt.com
      nimraazmi@dwt.com

Sean Sullivan (*pro hac vice* pending)
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017-2566
Tel.: 213.633.8644
Email: seansullivan@dwt.com

*Attorneys for Defendant The Economist Newspaper NA, Inc.*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KLAY ANDERSON and JOSE URRUTIA, individually and on behalf of all others similarly situated, <br><br>     Plaintiffs, <br><br> v. <br><br> THE ECONOMIST NEWSPAPER NA, INC. <br><br>     Defendant. | **DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT OR IN THE ALTERNATIVE, COMPEL ARBITRATION OF PLAINTIFF URRUTIA'S CLAIM AND MEMORANDUM IN SUPPORT** <br><br> Case No. 2:23-cv-00878 <br><br> The Honorable Howard C. Nielson, Jr. <br><br> ORAL ARGUMENT REQUESTED |

1

## **TABLE OF CONTENTS**

RELIEF SOUGHT ................................................................................................................. 1

BRIEF STATEMENT OF GROUNDS FOR MOTION ..................................................... 1

INTRODUCTION ............................................................................................................... 2

FACTUAL BACKGROUND .............................................................................................. 2

    A.    The Parties ........................................................................................................ 2

    B.    The Amended Complaint .................................................................................. 3

    C.    The NISNPIA ................................................................................................... 3

LEGAL STANDARD .......................................................................................................... 4

ARGUMENT ....................................................................................................................... 5

I.    The Court Lacks of Subject Matter Jurisdiction ....................................................... 5

    A.    Plaintiffs Cannot Establish Article III Standing ............................................. 5

    B.    Plaintiffs Cannot Bring This Action on Behalf of a Class ............................... 8

II.    Plaintiffs' Amended Complaint Must Be Dismissed for Failure to State a Claim ............... 10

    A.    TEN Is Not a Utah Domiciled Commercial Entity. ....................................... 11

    B.    Plaintiffs Have Not Plausibly Pled that TEN Disclosed Their Information ................. 12

III.    In the Alternative, This Court Must Compel Individual Arbitration of Plaintiff Urrutia's Claim and Dismiss Him from This Case. ....................................................................... 14

    A.    Plaintiff Urrutia Agreed to TEN's Terms and Conditions, Including Arbitration, and Acknowledged TEN's Privacy Policy ........................................................ 14

        1.    Plaintiff Urrutia Agreed to the Arbitration Provision ................................. 17

        2.    Subscribers Are Given Notice That TEN Might Disclose Their Information to Third Parties ......................................................................................... 18

    B.    Plaintiff Urrutia Entered into a Binding Arbitration Agreement. ................... 19

    C.    The Arbitration Agreement Covers this Dispute ............................................ 21

CONCLUSION ................................................................................................................... 23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACI Payments, Inc. v. Conservice, LLC*,
  No. 121CV00084RJSCMR, 2022 WL 622214 (D. Utah Mar. 3, 2022)...................................20

*Armijo v. Prudential Ins. Co. of Am.*,
  72 F.3d 793 (10th Cir. 1995) ........................................................................................19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................................4

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) ......................................................................................................10

*Baker v. Comcast Corp.*,
  No. 2:19-CV-00652, 2020 WL 3895411 (D. Utah July 10, 2020) ....................................19, 20

*Baker v. USD 229 Blue Valley*,
  979 F.3d 866 (10th Cir. 2020) ..........................................................................................5

*Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*,
  956 F.3d 1228 (10th Cir. 2020) ........................................................................................13

*Belnap v. Iasis Healthcare*,
  844 F.3d 1272 (10th Cir. 2017) ........................................................................................21

*Bigpayout, LLC v. Mantex Enterprises, Ltd.*,
  No. 2:12-CV-01183-RJS, 2014 WL 5149301 (D. Utah Oct. 14, 2014) ....................................5

*Blood v. Labette Cnty. Med. Ctr.*,
  No. 522CV04036HLTKGG, 2022 WL 11745549 (D. Kan. Oct. 20, 2022) ..............................8

*Bradford v. Pilot Travel Centers, LLC*,
  No. 2:18-CV-202 TS-DBP, 2018 WL 4082345 (D. Utah Aug. 27, 2018) ...............................14

*Camoras v. Publishers Clearing House, LLC*,
  Case No. 4:23-cv-00118-DN-PK (D. Utah May 17, 2024) (ECF No. 24) ..............................12

*Curry v. Mrs. Fields Gifts, Inc.*,
  No. 22-cv-651, 2023 WL 6318108 (D. Utah Sept. 28, 2023)...............................................9, 10

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014)........................................................................................................11

ii

*Dish Network L.L.C. v. Ray*,
    900 F.3d 1240 (10th Cir. 2018) ........................................................................22

*Dodson Int'l Parts, Inc. v. Williams Int'l Co. LLC*,
    12 F.4th 1212 (10th Cir.2021) .........................................................................23

*Fernwood Place LC v. Layton Partners Holdings LP*,
    P.3d 165 (Utah Ct. App. 2023) .......................................................................14

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995) ........................................................................................20

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    592 U.S. 351 (2021) ........................................................................................11

*Friedman v. Dollar Thrifty Automotive Group, Inc.*,
    No. 12-cv-02432-WYD-KMT, 2015 WL 8479746 (D. Colo. Dec. 10, 2015) ...................9, 10

*Fullmer v. A-1 Collection Agency, LLC*,
    No. 4:20-CV-00143-DN-PK, 2022 WL 1538675 (D. Utah May 16, 2022) ...........................9

*Gonzales v. City of Castle Rock*,
    307 F.3d 1258 (10th Cir. 2002) .........................................................................4

*Hancock v. Am. Tel. & Tel. Co.*,
    701 F.3d 1248 (10th Cir. 2012) ........................................................................20

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    586 U.S. 63 (2019) .....................................................................................21, 22

*Hugger-Mugger, L.L.C. v. Netsuite, Inc.*,
    No. 2:04-CV-592TC, 2005 WL 2206128 (D. Utah Sept. 12, 2005) .....................................20

*iGlobal Exports, LLC v. Shoemaker*,
    No. 4:22-CV-00044-TC-PK, 2022 WL 4257488 (D. Utah Sept. 15, 2022) .........................22

*In re Castletons, Inc.*,
    990 F.2d 551 (10th Cir. 1993) .........................................................................13

*Inception Mining, Inc. v. Danzig, Ltd.*,
    No. 2:17-CV-00944-DN, 2018 WL 565716 (D. Utah Jan. 24, 2018) .................................22

*Johnson v. Spencer*,
    950 F.3d 680 (10th Cir. 2020) ...........................................................................5

*KPMG LLP v. Cocchi*,
    565 U.S. 18 (2011) (per curiam) ......................................................................19

4873-2086-7008\1

*Labertew v. WinRed, Inc.*,
   No. 2:21-CV-555-TC, 2022 WL 1568924 (D. Utah May 18, 2022) ....................................12

*Laufer v. Looper*,
   22 F.4th 871 (10th Cir. 2022) ...........................................................................5, 6, 7

*Lewis v. Eassit, Inc.*,
   No. 222CV00121HCNDAO, 2023 WL 2522812 (D. Utah Mar. 15, 2023)..........................10

*Love v. Overstock.com, Inc.*,
   No. 222CV00118DBBCMR, 2022 WL 3345730 (D. Utah Aug. 12, 2022)..........................14

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...............................................................................................5

*Matney v. Barrick Gold of N. Am.*,
   80 F.4th 1136 (10th Cir. 2023) ................................................................................5

*McCombs v. Delta Grp. Elecs., Inc.*,
   676 F. Supp. 3d 1064 (D.N.M. 2023) .......................................................................8

*Miller v. Corinthian Colleges, Inc.*,
   769 F. Supp. 2d 1336 (D. Utah 2011)......................................................................10

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983).................................................................................................19

*Murtagh v. Bed Bath & Beyond Inc.*,
   No. 19-CV-03487-CMA-NYW, 2020 WL 4195126 (D. Colo. July 3, 2020),
   *report and recommendation adopted*, No. 19-CV-03487-CMA-NYW,
   2020 WL 4193553 (D. Colo. July 21, 2020) .............................................................9

*Nazaruk v. eBay, Inc.*,
   No. 2:06CV242DAK, 2006 WL 2666429 (D. Utah Sept. 14, 2006),
   *aff'd*, 223 F. App'x 815 (10th Cir. 2007)...............................................................20

*O'Toole v. Northrop Grumman Corp.*,
   499 F.3d 1218 (10th Cir. 2007) ..............................................................................12

*Penhall v. Young Living Essential Oils, LC*,
   No. 220CV00617DBBCMR, 2022 WL 15504063 (D. Utah Oct. 27, 2022)...................20, 21

*Reifenberger v. Autovest*
   LLC, No. 2:20-CV-571-DAK-JCB, 2021 WL 212237 (D. Utah Jan. 21, 2021)...................23

*Route App, Inc. v. Heuberger*,
   No. 2:22-CV-291-TS-JCB, 2022 WL 2316377 (D. Utah June 28, 2022) .............................20

iv

*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*,
　559 U.S. 393 (2010)..........................................................................................8, 9

*Shields v. Pro. Bureau of Collections of Maryland, Inc.*,
　55 F.4th 823 (10th Cir. 2022) ..............................................................................7, 8

*Singh v. DISH Network LLC*,
　No. 2:18-CV-00856-DAK, 2019 WL 3037882 (D. Utah July 11, 2019) ...............14

*Smith v. United States*,
　561 F.3d 1090 (10th Cir. 2009) ..............................................................................5

*TransUnion LLC v. Ramirez*,
　594 U.S. 413 (2021)..............................................................................................6, 7

*Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*,
　13 F.3d 330 (10th Cir. 1993) ...............................................................................23

**Statutes**

9 U.S.C. § 2 ...................................................................................................................19

28 U.S.C. § 1332 ............................................................................................................1

Utah Code Ann. § 13-37-101, *et seq.*............................................................................1, 3

Utah Code Ann. § 13-37-102, *et seq.*.............................................................2, , 4, 11, 12

Utah Code Ann. § 13-37-201, *et seq.*..........................................................................4, 12

Utah Code Ann. § 13-37-202 ........................................................................................4

Utah Code Ann. § 13-37-203, *et seq.*........................................................................1, 4, 8, 9

Utah Code Ann. § 78B-2-302 ..................................................................................13, 14

Utah Code Ann. § 78B-2-305 ......................................................................................14

**Other Authorities**

Fed. R. Civ. P. 12(b)(1)..........................................................................................1, 5, 14

Fed. R. Civ. P. 12(b)(6)................................................................................................1

Utah State House of Rep. 2003 Gen. Session, Day 12, H.B. 0040S01 (Jan. 29, 2003) ........ *passim*

## RELIEF SOUGHT

Defendant The Economist Newspaper NA, Inc. ("TEN" or "Defendant") seeks an order dismissing Plaintiffs Klay Anderson and Jose Urrutia's (collectively, "Plaintiffs") Amended Complaint with prejudice under Fed. R. Civ. P. 12(b)(1) and (6), or in the alternative, compelling Plaintiff Urrutia to submit his individual claims to arbitration.

## BRIEF STATEMENT OF GROUNDS FOR MOTION

Plaintiffs have sued on behalf of themselves and a putative class under Utah's Notice of Intent to Sell Nonpublic Personal Information Act, Utah Code Ann. § 13-37-101, *et seq.* ("NISNPIA" or the "Act"). This motion addresses Plaintiffs' Amended Complaint. It does not rectify the deficiency of the original pleading, it merely repeats the same shortfalls, and its claims are subject to dismissal on several grounds.

1. The Court lacks subject matter jurisdiction because Plaintiffs have only alleged a statutory harm without a common law analogue and, under Supreme Court precedent, which is insufficient to establish Article III standing. *See* Point I.A.

2. Plaintiffs cannot bring this action on behalf of a putative class. The NISNPIA explicitly forbids class actions, Utah Code Ann. § 13-37-203(3), and without the class claims, Plaintiffs do not satisfy 28 U.S.C. § 1332's amount in controversy requirement because the NISNPIA permits only a $500 penalty for a statutory violation. *See* Point I.B.

3. Plaintiffs have failed to state a claim, because their allegations do not—and cannot—establish that TEN is "at home" in Utah which is a required element under the NISNPIA. *See* Point II.A.

4. Plaintiffs have not plausibly pled that TEN disclosed their information to third parties. *See* Point II.B.

5. In the alternative, Plaintiff Jose Urrutia's claims are subject to mandatory individual arbitration pursuant to TEN's Terms and Conditions (the "Terms"), which he affirmatively agreed to when he purchased his *The Economist* subscriptions. *See* Point III.

1

## INTRODUCTION

After Defendant TEN informed Plaintiffs' counsel that their original plaintiff, Jess Collins, was subject to a binding arbitration agreement and class action waiver, Plaintiffs' counsel dropped her and substituted Urrutia and Anderson as plaintiffs in this action. These new plaintiffs cannot, however, save the Amended Complaint ("AC") which remains rife with deficiencies and should be dismissed with prejudice.

**First**, the Court does not have subject matter jurisdiction over the action because the Act provides that claims under it cannot be brought as a class action and Plaintiffs thus cannot establish the requisite amount in controversy. **Second**, Plaintiffs have pled only a statutory harm based on the purported violation of the NISNPIA and do not have standing to bring their suit in federal court. **Third**, the Act, which is expressly limited to a "commercial entity" that has "an office or other place of business located in Utah" does not apply to TEN, which has no such connection to the state. *See* Utah Code Ann. § 13-37-102(2)(a). **Fourth**, the Amended Complaint fails to adequately plead that TEN disclosed Plaintiffs' personal information to third parties. **Fifth**, Plaintiff Urrutia, like Ms. Collins before him, agreed to arbitrate all his disputes with TEN. His claim against TEN must be brought in an individual arbitration.

## FACTUAL BACKGROUND

### A.    The Parties

Plaintiff Klay Anderson is a *former* subscriber to *The Economist*. AC ¶ 9; Declaration of Nada Arnot in Support of Defendant's Motion to Dismiss ("Arnot Decl.") ¶ 30. He purchased subscriptions to *The Economist* on three different occasions: August 12, 2007, April 25, 2015, and October 19, 2019. *See id.* Anderson canceled his subscription to *The Economist* on August 10, 2022. *See id.*

Plaintiff Jose Urrutia is a current subscriber to *The Economist.* AC ¶ 14; Arnot Decl. ¶ 17. He purchased subscriptions to *The Economist* via its website on three different occasions: November 28, 2015, December 21, 2019, and April 1, 2023. Arnot Decl. ¶ 14.

Defendant TEN is the publisher of *The Economist*, a weekly print and digital magazine that reports on current affairs, international business, politics, technology, and culture. AC ¶ 18; Arnot Decl. ¶ 6. TEN is a Delaware corporation with its principal place of business in New York, New York. AC ¶ 18; Arnot Decl. ¶ 7. TEN does *not* maintain an office or place of business in Utah. Arnot Decl. ¶¶ 9, 13.

### B.    The Amended Complaint

The original complaint was filed by Jess Collins on behalf of herself and a putative class of Utah residents. Klay Anderson and Jose Urrutia were substituted as plaintiffs in an apparent effort to sidestep TEN's governing Terms and Conditions which mandate that the claims alleged here must be addressed as individual (not class) claims and in an arbitration.

The Amended Complaint alleges claims on behalf of Utah residents whose "Private Purchase Information" TEN obtained through a "consumer transaction" and "disclosed…to one or more third party" in violation of the NISNPIA. AC ¶ 58. The putative class stretches back twenty years to January 1, 2004. *Id.* TEN's only alleged connection to the state of Utah is that it maintained a kiosk, at some undefined time, in the Salt Lake City airport. AC ¶ 18.

### C.    The NISNPIA

The Utah legislature enacted the NISNPIA in 2003. The statute applies *only* to "commercial entities," that have "an office or other place of business located in [Utah]." Utah Code Ann. §13-37-101(2)(a)(i). For the Act to apply, a company must be "domiciled in the state of Utah." Utah State House of Rep. 2003 Gen. Session, Day 12, H.B. 0040S01 (Jan. 29, 2003) at -49:41—

3

to -49:25, available at https://le.utah.gov/av/floorArchive.jsp?markerID=12385 ("H.B. 0040S01 Legislative History").[1]

The Act only applies if the commercial entity intends to disclose nonpublic information to a third party for compensation. Utah Code Ann. §13-37-201(2)(a).[2] Nonpublic information is defined as "information that (1) is not public information [which excludes a person's name, telephone number, and street address] and (2) either alone or in conjunction with public information, identifies a person in distinction from other persons." *Id.* §13-37-102(5)–(6). The Act provides for statutory damages of $500 for the failure to provide the requisite notice when collecting non-public personal information. *Id.* §13-37-203(2)(a). The Act specifically *prohibits* class actions. *Id.* §13-37-203(3).

Moreover, disclosure of a consumer's nonpublic information obtained by a Utah commercial entity "as a result of a consumer transaction," *id.* §13-37-201(1)(b), is prohibited *only* where the Utah entity does not provide written or oral notice. *Id.* §13-37-202(3).[3]

## LEGAL STANDARD

On a motion to dismiss for failure to state a claim, a court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to *state* a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court "need not accept threadbare recitals of the elements of a cause of action [that are] supported by mere conclusory

---

[1] The Court may take judicial notice of the legislative history of the NISNPIA on a motion to dismiss. *Gonzales v. City of Castle Rock*, 307 F.3d 1258, 1266 n.2 (10th Cir. 2002) (case history omitted).

[2] A "consumer transaction" is also limited to a transaction "that is initiated or completed in this state." Utah Code Ann. §13-37-102(4)(A).

[3] The bill's sponsor, Rep. Douglas Aargard was clear: "I'm not prohibiting the businesses selling this information, it's strictly notice." H.B. 0040S01 Legislative History at -56.45 to -56:09.

4

statement." *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1144–45 (10th Cir. 2023) (cleaned up).[4]

On a 12(b)(1) motion to dismiss, a party "may challenge the court's subject-matter jurisdiction through a facial or factual attack." *Laufer v. Looper*, 22 F.4th 871, 875 (10th Cir. 2022). "A facial attack assumes the allegations in the complaint are true and argues they fail to establish jurisdiction." *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020). When a defendant challenges the *facts* supporting subject matter jurisdiction, "the court 'may not presume the truthfulness of the complaint's factual allegations.'" *Bigpayout, LLC v. Mantex Enterprises, Ltd.*, No. 2:12-CV-01183-RJS, 2014 WL 5149301, at *2 (D. Utah Oct. 14, 2014). Instead, the court "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing[.]" *Id.* (citations omitted).

## ARGUMENT

### I.    THE COURT LACKS OF SUBJECT MATTER JURISDICTION

The case is subject to dismissal for lack of subject matter jurisdiction.  Plaintiffs' allegation of a mere statutory violation does not establish Article III standing, and should be dismissed under Rule 12(b)(1) motion to dismiss.  *See generally Baker*, 979 F.3d 866.

#### A.    Plaintiffs Cannot Establish Article III Standing

Plaintiffs cannot, as a matter of law, establish Article III standing because they have alleged a purely statutory—not a concrete—harm which is insufficient as a matter of law.  Plaintiffs bear the burden of demonstrating standing and federal court jurisdiction.  *Lujan v. Defenders of Wildlife*,

---

[4] A court can consider "attached exhibits, and documents incorporated into the Complaint by reference" on a 12(b)(6) motion to dismiss.  *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citations omitted).  It may also take judicial notice of "facts which are a matter of public record, without converting a motion to dismiss into a motion for summary judgment." *Johnson v. Spencer*, 950 F.3d 680, 705 (10th Cir. 2020).

5

504 U.S. 555, 561 (1992).  To establish Article III standing, a plaintiff must show "that he suffered an injury in fact that is concrete, particularized, and actual or imminent."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  A mere "informational injury" with no identified "'downstream consequences' from failing to receive the required information" does not suffice. *Laufer*, 22 F.4th at 881.

In *TransUnion,* the Supreme Court "rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'"  594 U.S. at 426 (citing *Spokeo, Inc. v. Robins,* 578 U.S. 330, 341 (2016)).  Legislative bodies cannot legislate around Article III standing by "enact[ing] an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is."  *Id.*  To determine whether a claim is sufficiently "concrete," a court must "assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts."  *Id.* at 424 (citing *Spokeo,* 578 U.S. at 341).  Crucially, "[t]hat inquiry asks whether plaintiffs have identified *a close historical or common-law analogue for their asserted injury*."  *Id.* (emphasis added).

Here, Plaintiffs allege a bare violation of the Utah statute.  AC ¶ 7; *see also id.* ¶¶ 61, 80. They make no attempt to anchor their alleged injury to any "close historical or common-law analogue." *TransUnion LLC*, 594 U.S. at 424.  To the contrary, Plaintiffs seek redress for privacy rights afforded to them solely by statute, AC ¶ 7, and without common law analogue.  Under clear Supreme Court precedents, Plaintiffs have not pled a concrete harm that can confer standing.

Plaintiffs' standing is not advanced by their claims that TEN did not provide prior notice of its alleged third-party information disclosure in alleged violation of the NISNPIA.  AC ¶¶ 1, 3,

7, 11, 16, 20, 55-57.  At most, these allegations circle around an informational injury that is insufficient to establish Article III standing.  *See TransUnion LLC*, 594 U.S. at 415; *Laufer*, 22 F.4th at 880-81.  In *Laufer*, for example, the plaintiff claimed that the defendant violated the Americans with Disabilities Act ("ADA") by claiming that defendant hotel's website "[l]acked information about accessibility," 22 F.4th at 874, and that she suffered harm after visiting the hotel and discovering that it was non-complaint with ADA regulations.  *Id.* at 878.  The Tenth Circuit dismissed the action holding that this lack of notice and non-compliance was nothing more than the "violation of a legal entitlement alone," which is "insufficient under *Spokeo* and *TransUnion* to establish that Ms. Laufer suffered a concrete injury."  *Id.* at 878.  The Tenth Circuit similarly determined that Plaintiffs' claims relating to a lack of prior notice insufficiently alleged no more than a "violation of a legal entitlement alone." *Id.*

Plaintiffs try to dress up their threadbare allegations by pointing to an alleged disclosure of their personal information to third parties, *e.g.,* AC ¶ 5, and allegations of increased receipt of junk mail. AC ¶ 1.  Neither can establish constitutional standing.

Initially, TEN's alleged disclosure of Plaintiffs' name, address, and purchase of *The Economist* to "data aggregators and appenders," *e.g.,* AC ¶¶ 1, 5, 11, 16, 50, is not analogous to a historical common law tort—namely, invasion of privacy.   In that regard, *Shields v. Pro. Bureau of Collections of Maryland, Inc.*, 55 F.4th 823 (10th Cir. 2022) is instructive.  There, plaintiff alleged that a debt collector violated the Fair Debt Collection Practices Act by disclosing information about her debt to a third-party mailing service.  *Id.* at 827.  This third-party mailing service then sent letters to plaintiff about her debt. *Id.* The Tenth Circuit concluded that plaintiff had "failed to allege anything close to the required publicity element," because the debt collector's disclosure to the outside mailer was not a disclosure to "the public at large nor someone likely to

widely communicate her debt." *Id.* at 829.  Similarly here, TEN's alleged disclosure of Plaintiffs' information to data aggregators is not a disclosure to the public at large nor to someone likely to communicate the information to the public at large such that the alleged disclosure is analogous to the tort of public disclosure of private facts. Plaintiffs have not—and cannot—establish a common law tort analogue for their alleged statutory injury, dooming their bid for Article III standing.

Moreover*,* complaints about increased junk mail/communications do not establish Article III standing.  *See, e.g., McCombs v. Delta Grp. Elecs., Inc.*, 676 F. Supp. 3d 1064, 1074 (D.N.M. 2023) ("courts have declined to confer standing when considering an increase in spam communications"); *Blood v. Labette Cnty. Med. Ctr.*, No. 522CV04036HLTKGG, 2022 WL 11745549, at *6 (D. Kan. Oct. 20, 2022) ("alleged inconvenient disruptions (such as spam calls, texts, and emails) do not constitute an injury in fact").  Plaintiffs' threadbare allegation that they received a "barrage of junk mail," AC ¶ 1, is not enough to establish Article III standing.

Plaintiffs' failure to plead a concrete injury requires dismissal of the Amended Complaint.

**B.     Plaintiffs Cannot Bring This Action on Behalf of a Class**

The plain language of the NISNPIA prohibits class actions: "[a] person may *not* bring a class action under this chapter."  Utah Code Ann. § 13-27-203(3).  In determining whether Rule 23 allows Plaintiffs to override NISNPIA's class action bar the Court is guided by Justice Stevens' controlling concurrence in *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010).  That inquiry hinges on "whether the state law actually is part of a State's framework of substantive rights or remedies." *Id.* at 419 (Stevens, J., concurring).  Federal courts cannot apply a rule where its application "effectively abridges, enlarges, or modifies a state-created right or remedy." *Id*. at 422–23.  In other words, "federal rules cannot displace a State's definition of its own rights or remedies." *Id* at 418.  Here, because the Act's class action bar is substantive, Rule 23 cannot enlarge its rights and remedies.

8

Allowing Plaintiffs to maintain a class action under Rule 23 would indisputably "displace [Utah's] definition of its own…remedies." *Id.* A law is substantive where it "'affect[s] recovery or non-recovery,'" and when a "state law creates a cause of action [and] defines the scope of that cause of action." *Fullmer v. A-1 Collection Agency, LLC*, No. 4:20-CV-00143-DN-PK, 2022 WL 1538675, at *3 (D. Utah May 16, 2022). In *Fullmer*, for example, the court found no Rule 23 preemption of the Utah consumer protection law's class action bar, because that bar was so intertwined with a state right or remedy" that it functions "to define the scope of the state-created right") (quotation marks omitted). *Id.* at *4 n.59

NISNPIA's class action bar is substantive as it both affects recovery *and* defines scope. Utah Code Ann. § 13-37-203. This class action bar is also "intertwined" with NISNPIA's $500 penalty, part and parcel of a purposeful policy choice, as Rep. Aargard put it, "to avoid…any unintended consequences," H.B. 0040S01 Legislative History at -1:00:26 to -59:48—like potentially ruinous liability for millions of dollars through a mass claim.[5]

---

[5] This conclusion is in line with other decisions. In evaluating a Colorado state consumer statute, which—like the NISNPIA—"precludes private class actions," the District of Colorado followed Justice Stevens' *Shady Grove* concurrence and found that applying Rule 23 to "allow[] private class actions…where no such actions are contemplated…would logically 'enlarge or modify' the substantive rights or remedies conferred under" the statute. *Murtagh v. Bed Bath & Beyond Inc.*, No. 19-CV-03487-CMA-NYW, 2020 WL 4195126, at *7 (D. Colo. July 3, 2020), *report and recommendation adopted*, No. 19-CV-03487-CMA-NYW, 2020 WL 4193553 (D. Colo. July 21, 2020). Similarly, in *Friedman v. Dollar Thrifty Automotive Group, Inc.*, No. 12-cv-02432-WYD-KMT, 2015 WL 8479746 (D. Colo. Dec. 10, 2015), the court, following Justice Stevens' *Shady Grove* concurrence, concluded that "the class action prohibition defines the scope of the state-created right, namely the right to bring a lawsuit for violations of the state's consumer-protection law." *Id.* at *4 (quoting *In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1165 (D. Minn. 2014)). The court therefore held that under Justice Stevens' analysis, "the restriction on class actions in the CCPA is part of the State of Colorado's framework of substantive rights or remedies." *Id.* at *5.

Defendant respectfully disagrees with the non-binding decision in *Curry v. Mrs. Fields Gifts, Inc.*, No. 22-cv-651, 2023 WL 6318108 (D. Utah Sept. 28, 2023), which found that NISNPIA's class action bar was not substantive. That decision hinged on the court's observation that NISNPIA's class action bar was "cleanly divisible" in the statutory text and therefore could be "surgical[ly]

9

Here too, the NISNPIA's class action prohibition "defines the scope of the state-created right" and is therefore embedded in Utah's "framework of substantive rights or remedies." *Friedman,* 2015 WL 8479746, at *4. To apply Rule 23 to allow a class action to proceed in contravention of the statute's plain text and underlying legislative intent would impermissibly enlarge and modify NISNPIA's substantive rights and remedies.  And this Rule 23 cannot do. Plaintiffs' class claims (and therefore their individual claim) must be dismissed.[6]

## II.    PLAINTIFFS' AMENDED COMPLAINT MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM

Plaintiffs' Amended Complaint fails to rectify the deficiencies of its predecessor and is subject to dismissal.

---

remov[ed]" while leaving "the rights and remedies otherwise provided by the Act totally intact." *Id.* at *6. The court's formalistic approach ignores the fundamental legislative intent behind the NISNPIA and how the class action bar is inextricably intertwined with the Legislature's broader scheme of purposefully "limited" consequences to avoid "unintended" outcomes. H.B. 0040S01 Legislative History at -1:00:26 to -59:48. That a court can strike a line from a statute does not mean that the line does not go to the heart of the statute's rights, remedies, and scope. This Court should decline to follow that decision.

[6] Separately, Plaintiff Urrutia cannot bring this case as a class action, because when he accepted the Terms, he agreed to a class action waiver, which stated:

> YOU AND THE ECONOMIST GROUP AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION.

Arnot Decl. Ex. C at 19; *id.* ¶ 28.  Class action waivers are valid under Utah law. *See Miller v. Corinthian Colleges, Inc.,* 769 F. Supp. 2d 1336, 1348–49 (D. Utah 2011); *Lewis v. Eassit, Inc.*, No. 222CV00121HCNDAO, 2023 WL 2522812, at *3 (D. Utah Mar. 15, 2023).  They are also routinely enforced as to consumer claims like Plaintiffs' claims under the NISNPIA.  *See AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 342-43 (2011) (class action waiver enforceable as to consumer claims).  Since Plaintiff Urrutia cannot pursue a class action, his class claims must be dismissed.

## A.    TEN Is Not a Utah Domiciled Commercial Entity.

As a threshold matter, NISNPIA does not apply because TEN is not a commercial entity domiciled in Utah.  The NISNPIA is expressly limited to Utah commercial entities which have "an office or other place of business located in [Utah]; and (ii) in the ordinary course of business transact[] a consumer transaction in [Utah]." Utah Code Ann. § 13-37-102(2)(a).  The legislative history also makes clear that the Act was intended to apply only to those commercial entities that are "at home" in Utah:

> Rep. Shurtliff:  Now many of these companies are national companies.  So, can we do that, or would that just regulate the Utah consumer?
>
> Rep. Aargard:  This would pertain to companies **domiciled** in the state of Utah.

H.B. 0040S01 Legislative History at -49:41—to -49:25   (emphasis added).

A corporation is "domiciled" (or essentially, "at home") in its place of incorporation of and principal place of business.  *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358–59 (2021).  TEN is a Delaware corporation with its principal place of business in New York, New York. AC ¶ 18; ECF No. 16; Arnot Decl. ¶ 7.  Plaintiffs' effort to shoehorn TEN into the statute rests on a purported *Economist*-branded kiosk at the Salt Lake City airport. AC ¶ 18. Initially, TEN has never owned or operated a kiosk, business or maintained an office in Utah, including at the Salt Lake City airport. *See* Arnot Decl. ¶¶ 9, 10. And the purported existence of a kiosk (operated by an unidentified party) that, at some undisclosed point, might have advertised that it offers *The Economist*, does not make TEN at home in Utah.  *See Daimler AG v. Bauman*, 571 U.S. 117, 139 n.20 (2014) ("A corporation that operates in many places can scarcely be deemed at home in all of them.").

Indeed, the kiosk that Plaintiffs point to necessarily has been *closed* since at least December 2020. Concourse C – where the kiosk was allegedly located – has been closed since fall 2020 when

the Salt Lake City airport underwent a remodel.[7] *See* Arnot Decl. Exs. A & B[8]; *see also O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224-25 (10th Cir. 2007) (taking judicial notice of adjudicative fact well-known in court's territorial jurisdiction that is not subject to dispute). Without a place of business in Utah TEN is not subject to the statute. *See* Utah Code Ann. § 13-37-102(2)(a); *See also Camoras v. Publishers Clearing House, LLC*, Case No. 4:23-cv-00118-DN-PK (D. Utah May 17, 2024) (ECF No. 24) (having a registered agent in Utah insufficient to state a claim under the Act).

TEN is not located in Utah and the Amended Complaint should be dismissed with prejudice on that basis alone.

### B.    Plaintiffs Have Not Plausibly Pled that TEN Disclosed Their Information

The Amended Complaint's boilerplate allegations that TEN disclosed Plaintiffs' private information to unidentified third parties for compensation is based on pure speculation.[9] No third

---

[7] Scott McKane, *One last look inside the old Salt Lake City Airport before it is demolished*, Fox 13 (Nov. 24, 2020), https://www.fox13now.com/news/salt-lake-city-international-airport/one-last-look-at-the-old-salt-lake-city-airport-before-it-is-demolished.

[8] Arnot    Decl.    Ex.    A    is    available    at https://web.archive.org/web/20201026193432/https:/slcairport.com/dining-and-shopping/, and Ex. B is available at https://web.archive.org/web/20201202060226/https:/slcairport.com/dining-and-shopping/. The Salt Lake City airport's webpages show that the airport's website listed kiosk in October 2020 but it was delisted by December 2020. *See Labertew v. WinRed, Inc.*, No. 2:21-CV-555-TC, 2022 WL 1568924, at *7 (D. Utah May 18, 2022) (courts can "take judicial notice of factual information found on the world wide web.").

[9] Plaintiff Urrutia's claims must also be dismissed because TEN *did* provide him with required notice under the Act. *See infra* § III.A.2.

The NISNPIA's model language for the required consumer-facing notice provides: "We may choose to disclose nonpublic personal information about you, the consumer, to a third party for compensation." *Id.* § 13-37-201(3)(a). A Utah commercial entity's notice under NISNPIA must be made so that "a reasonable person would perceive the notice before providing the nonpublic personal information." *Id.* § 13-37-201(3)(c).

TEN's April 2023 Privacy Policy amply satisfies these requirements. The April 2023 policy specifically informed Plaintiff Urrutia that TEN could "pass your information to specially selected

12

parties are identified.  Instead, Plaintiffs rely on generic descriptors of entities like, *inter alia*, "data aggregators," "list brokers," "political organizations," "other consumer-facing businesses," and "non-profit organizations seeking to raise awareness and solicit donations."  AC ¶¶ 1, 11, 51, 63. This impermissibly vague laundry list of entities cannot satisfy Plaintiffs' pleading burden.  To the extent Plaintiffs allege that "TEN, through list broker NextMark, Inc. ("NextMark"), offers to provide renters access to the mailing list titled 'The Economist Mailing List,'" they do not offer a single, non-speculative fact showing that Plaintiffs' private information was shared through this NextMark mailing list.  AC ¶ 2; *id.* Ex. A.  Indeed, the screenshot included does nothing to show that TEN disclosed Plaintiffs' information to anyone or that NextMark even *has* Plaintiffs' information.  *Id.* ¶ 1; *id.* Ex. A.  As such, not only are Plaintiffs' allegations about TEN's information disclosure to third parties speculative, they are implausible.  *See Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1234–35 (10th Cir. 2020) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (quoting *Iqbal*, 556 U.S. at 678)).[10]

---

third parties who would like to contact you with information regarding their own products and services such as other subscriptions, events or content services." Arnot Decl. Ex. D at 4 (the "Notice"). This Notice substantially follows NISNPIA's model notice language. TEN's March 2022 Privacy Policy—which contained the Notice—was conspicuously available to Plaintiff Urrutia before he completed his subscription purchase. As described above, "**Privacy policy**" was emphasized in bold and underlined font on the checkout page of his subscription and hyperlinked to the Notice. *Id.* As a condition of completing his subscription, moreover, Plaintiff Urrutia was required to manifest his assent to the privacy policy, including this Notice. Arnot Decl. ¶ 21. He did so. *Id.* ¶ 25. He cannot now claim otherwise.

[10] Anderson's claim also fails because the statute of limitations on it has expired.  While the Act does not provide a limitations period, it is a penalty statute to which Utah Code Ann. § 78B-2-302's one-year period applies.  The Tenth Circuit has defined "penalty" as "a sum of money which the law exacts the payment of by way of punishment for doing some act which is prohibited, or omitting to do some act which is required to be done." *In re Castletons, Inc.*, 990 F.2d 551, 557–58 (10th Cir. 1993).  The $500 penalty represents a state-imposed punitive measure—as opposed to compensation for actual damages—and Section 78B-2-302's one-year limitations period applies here.  Plaintiff Anderson's cause of action accrued on October 19, 2019, the day he last subscribed

## III.    IN THE ALTERNATIVE, THIS COURT MUST COMPEL INDIVIDUAL ARBITRATION OF PLAINTIFF URRUTIA'S CLAIM AND DISMISS HIM FROM THIS CASE.

Plaintiff Urrutia entered into a broad and binding arbitration agreement, which expressly reserved the question of arbitrability for the arbitrator and required individual arbitration of all claims by him against TEN.  In the alternative, this Court should compel arbitration of his claims and dismiss him from this action.[11]

### A.    Plaintiff Urrutia Agreed to TEN's Terms and Conditions, Including Arbitration, and Acknowledged TEN's Privacy Policy

When Plaintiff Urrutia signed up online for his subscription to *The Economist*, he agreed to and accepted TEN's Terms and Conditions, including the arbitration provision, class action waiver, and TEN's privacy policy when he signed up for his subscription.

When Plaintiff Urrutia purchased his subscription to *The Economist* through its website, https://subscribenow.economist.com (the "Website"), TEN's sign-up process for subscribers

---

to *The Economist* and TEN allegedly failed notify him of its third-party information disclosure. AC ¶ 10; Arnot Decl. ¶ 30.  As such, his one-year limitations period lapsed on October 19, 2020. Plaintiff Anderson's claim is time-barred and must be dismissed.

For this same reason, the Amended Complaint's class definition is overbroad and the class claim must be dismissed. Plaintiffs purport to represent a putative class of *The Economist* subscribers from January 1, 2004 onward.   AC ¶ 58.   But this purported class stretches not just years but *decades* beyond Utah Code Ann. § 78B-2-302's one-year limitations period.   Even if this Court finds that the NISNPIA's $500 penalty is not a penalty, Plaintiffs still could not maintain a class reaching back to January 1, 2004. Rather, the claim would be subject to Utah Code Ann.  § 78B-2-305(4)'s three-year limitations period for "liability created by the statutes of this state, other than for a penalty or forfeiture." *See Fermwood Place LC v. Layton Partners Holdings LP,* 2023 UT App 43, ¶¶ 11–12, 530 P.3d 165 (a three-year limitations period applies to liability under state statute, unless otherwise specified).

[11] Dismissal under Rule 12(b)(1) is appropriate where a court compels arbitration.  *See, e.g., Bradford v. Pilot Travel Centers, LLC*, No. 2:18-CV-202 TS-DBP, 2018 WL 4082345, at *2 (D. Utah Aug. 27, 2018); *Love v. Overstock.com, Inc.*, No. 222CV00118DBBCMR, 2022 WL 3345730, at *6 (D. Utah Aug. 12, 2022); *Singh v. DISH Network LLC*, No. 2:18-CV-00856-DAK, 2019 WL 3037882, at *2 (D. Utah July 11, 2019).

14

required customers to accept the operative Terms of Use[12] and Privacy Policy[13] before completing their purchase of a subscription. Arnot Decl. ¶ 21; *id.* Ex. E.  To sign up for a subscription to *The Economist* online through the Website in March 2022, a prospective subscriber had to navigate to a check out page on TEN's Website where they were required to fill in their name, address, and billing information. *Id.* ¶ 20; *id.* Ex. E.  Before a customer could click the purple checkout box and start their subscription, they were *required* to acknowledge their assent to TEN's Terms and Conditions and Privacy Policy.  *Id.*  A customer like Mr. Urrutia could not proceed with their subscription without affirmatively clicking a checkbox which stated in bold sans serif typeface "**I understand the <u>Terms and Conditions</u> and acknowledge the <u>privacy policy</u>**," as illustrated below:  *Id.* Ex. E; *id.* ¶ 21. The checkout page hyperlinks to both the Terms and the Privacy Policy, which are prominently bolded and underlined. *Id.* Ex. E; *id.* ¶ 22.  These hyperlinks directed the user to new TEN webpages containing the respective terms and policy.  *Id.*



*Id.* Ex. E. Plaintiff Urrutia could not have completed his subscription to *The Economist* without clicking assent to TEN's hyperlinked Terms and Privacy Policy.  *Id.* ¶ 21.  After checking his assent and clicking the checkout button, a subscriber would be taken to TEN's confirmation page.

---

[12] Arnot Decl. Ex. C,  *available at* https://www.economistgroup.com/terms-of-use-31-march-2023-to-30-june-2023.

[13] Arnot Decl. Ex. D, *available at* https://web.archive.org/web/20230401071548/https://www.economistgroup.com/privacy-policy.

*Id.* ¶ 23. The confirmation page included the phrase "**Terms of Cancellation**" in bold and underlined font and hyperlinked to TEN's 2022 Terms, as illustrated below:



*Id.* Ex. F.

After Plaintiff Urrutia's subscription was confirmed, he would have received an email from TEN which said, "Here are the terms and conditions and privacy policy associated with your purchase." *Id.* ¶ 24; *id.* Ex. G. "[T]erms and conditions" was distinctly underlined and hyperlinked to the March 2022 Terms; "privacy policy" was likewise underlined and hyperlinked to the 2022 Privacy Policy. *Id.*

Separately, the bottom of this email also hyperlinked to the Privacy Policy and the Terms and Conditions. *Id.*

When Mr. Urrutia purchased a subscription to *The Economist* online through TEN's Website in March 2022, he would have affirmatively clicked his acceptance of the Terms (including the arbitration clause and class action waiver) and Privacy Policy in effect as of that date. *Id.* ¶ 25.

### 1.    Plaintiff Urrutia Agreed to the Arbitration Provision

By accepting TEN's Terms, Plaintiff Urrutia agreed to resolve "all disputes" with TEN "arising in connection with" or "relating in any way to" TEN's "Terms or to [his] relationship with The Economist Group as a user or subscriber" through binding and final arbitration. TEN's Terms and Conditions in effect on or about March 2022 contained binding arbitration clause and class action waiver provisions which are clearly and distinctly set forth in the Terms' third paragraph, under a capitalized header declaring, "IMPORTANT NOTE FOR US USERS AND SUBSCRIBERS":

> Mandatory Arbitration. You and The Economist Group agree that any dispute, claim, or controversy between you and The Economist Group arising in connection with or relating in any way to these Terms or to your relationship with The Economist Group as a user or subscriber (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory) will be determined by mandatory binding individual (not class) arbitration. You and The Economist Group further agree that the arbitrator shall have the exclusive power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration provision or to the arbitrability of any claim or counterclaim. Arbitration is more informal than a lawsuit in court. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND COURT REVIEW OF AN ARBITRATION AWARD IS LIMITED. There may be more limited discovery than in court. YOU SPECIFICALLY AGREE THAT YOU ARE BOUND TO RESOLVE ALL DISPUTES IN ARBITRATION, AND YOU ACKNOWLEDGE THAT YOU ARE VOLUNTARILY AND KNOWINGLY FORFEITING YOUR RIGHT TO A TRIAL BY JURY AND TO OTHERWISE PROCEED IN A LAWSUIT IN STATE OR FEDERAL COURT. Arbitration shall be subject to the Federal Arbitration Act and shall be conducted by the American Arbitration Association (AAA) pursuant to the AAA's Consumer Arbitration Rules ("AAA Rules"), then in force. The AAA Rules, as well as instructions on how to file an arbitration proceeding with the AAA, appear at adr.org, or you may call the AAA at 1-800-778-7879.

*Id.* Ex. C at 18; *see also id.* ¶ 27.

17

The Terms also contained a class action waiver (in all capital letters) whereby Plaintiff Urrutia "AGREE[D]" that he could not bring a claim against TEN "AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION":

> No Class or Representative Proceedings; Class Action Waiver. YOU AND THE ECONOMIST GROUP AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION. Unless both you and The Economist Group agree, no arbitrator or judge may consolidate more than one person's claims or otherwise preside over any form of a representative or class proceeding.

*Id.* Ex. C at 19; *see also id.* ¶ 27.

There can be no dispute that Plaintiff Urrutia accepted TEN's Terms and therefore its arbitration clause and class action waiver.

### 2.    Subscribers Are Given Notice That TEN Might Disclose Their Information to Third Parties

TEN's 2023 Privacy Policy, which Plaintiff Urrutia acknowledged by clicking the check box when purchasing his subscription, clearly explains that TEN can collect certain types of personal information to provide products and services to the consumer. *Id.* Ex. D. To "fulfil a subscription to *The Economist*," and for its "Economic Events business and the Economist Intelligence Unit," the Privacy Policy explains that TEN will gather a subscriber's "name, postal address, email address, and payment details, job title, work email, company, country, and industry." *Id.* at 2. The Privacy Policy also makes clear that it does "not track or collect any sensitive information about you. This includes race, religion, ethnicity, and political opinion." *Id.* at 3. The Privacy Policy notes that "We primarily use your information for the purpose of delivering the products and services that you have chosen and to personalise our interactions (including advertising) with you." *Id.* The Privacy Policy explicitly notified subscribers that TEN can pass subscriber information on to third parties for marketing:

18

> We may pass your information to specially selected third parties who would like to contact you with information regarding their own products and services such as other subscriptions, events or content services. Those parties are responsible for their use of your data and you should read their privacy policies carefully.

*Id.* at 4. The Privacy Policy also explained that TEN may use subscriber information to "create audience profiles for personalised advertising, marketing or research and development on and off our websites." *Id.* at 5. Finally, the Privacy Policy advised users that TEN "will ask you if you wish to opt-out of such marketing when you first sign up to receive our products or service" and that users "can also update your preferences for your Economist subscription at any time…" *Id.* at 4.

## B.    Plaintiff Urrutia Entered into a Binding Arbitration Agreement.

Plaintiff Urrutia affirmatively entered into a valid arbitration agreement with TEN that compels individual mandatory arbitration of all disputes. The Federal Arbitration Act ("FAA") provides that agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects an "emphatic federal policy in favor of arbitral dispute resolution." *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (per curiam) (internal citations omitted). Questions concerning the scope of arbitrable issues are to be resolved by the Court in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, 797 (10th Cir. 1995) ("any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

As this Court noted in *Baker v. Comcast Corp.,* in determining whether to grant a motion to compel arbitration a court must decide "[1] whether the parties are bound by a given arbitration clause and [2] whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." No. 2:19-CV-00652, 2020 WL 3895411, at *2 (D. Utah July 10, 2020)

(citing *Beltran v. AuPairCare*, 907 F.3d 1240, 1250 (10th Cir. 2018)).  If the first two elements are satisfied, "the court must 'rigorously enforce' the terms of the arbitration agreement, resolving 'any doubts concerning the scope of arbitrable issues...in favor of arbitration.'"  *Id.* (quoting *Sanchez v. Nitro-Lift Techs.*, 762 F.3d 1139, 1145–46 (10th Cir. 2014)).

Courts "apply ordinary state-law principles that govern the formation of contracts" to determine whether parties agreed to arbitrate.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Under Utah law, "a binding contract is formed if there is mutual assent between the parties supported by consideration."  *Baker*, 2020 WL 3895411, at *2 (citing *John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205, 1207–08 (Utah 1987)).  A party may legally manifest its assent to a contract by a "click".  *See, e.g., Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 WL 2316377, at *3 (D. Utah June 28, 2022); *Nazaruk v. eBay, Inc.*, No. 2:06CV242DAK, 2006 WL 2666429, at *3 (D. Utah Sept. 14, 2006), *aff'd,* 223 F. App'x 815 (10th Cir. 2007); *Hugger-Mugger, L.L.C. v. Netsuite, Inc.*, No. 2:04-CV-592TC, 2005 WL 2206128, at *6 (D. Utah Sept. 12, 2005); *ACI Payments, Inc. v. Conserve, LLC*, No. 121CV00084RJSCMR, 2022 WL 622214, at *6 (D. Utah Mar. 3, 2022).  The Tenth Circuit and courts in this district have routinely enforced arbitration clauses presented through clickwrap[14], determining that presentation "via a hyperlink to a page separate from the one containing the box or button manifesting assent," provides ample notice to the user.  *Penhall v. Young Living Essential Oils, LC*, No. 220CV00617DBBCMR, 2022 WL 15504063, at *4–5 (D. Utah Oct. 27, 2022); *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1257–58 (10th Cir. 2012) (upholding arbitration

---

[14] Clickwrap agreements "require a user to agree to the terms and conditions before using a website or application—for example, by clicking a box stating 'I agree' to the terms of use are generally enforceable agreements." *Route App, Inc.,* 2022 WL 2316377, at *3.

clause in clickwrap agreement where customers "affirmatively manifest[ed] assent to the terms by clicking 'I Acknowledge' and 'I Agree' buttons").

Plaintiff Urrutia affirmatively agreed to TEN's Terms, including the arbitration clause and class action waiver, when he clicked the checkbox on the checkout page for his *The Economist* subscription. In *Penhall*, as here, the plaintiff agreed to an arbitration clause by clicking a box that acknowledged his acceptance of hyperlinked terms and conditions – including an arbitration clause. *See Penhall*, 2022 WL 15504063, at \*2. The court noted that the arbitration provision was "set apart with bold letters and a large font size" and explained clearly that "any controversy or claim arising out of or relating to the Agreement, or the breach thereof, will be settled by arbitration." *Id.* at \*6. Based on these facts, the court upheld the arbitration provision, concluding, "the Arbitration Agreement was available to read, easy to find, and made plain that claims involving the Agreement would be settled by binding arbitration." *Id.*

Likewise, Plaintiff Urrutia clicked a box acknowledging his acceptance of TEN's hyperlinked Terms. Arnot Decl. ¶ 21. Plaintiff Urrutia could only proceed with his April 2023 subscription *after* acknowledging the Terms which highlighted the arbitration clause and made the provision's breadth plain. *Id.* ¶¶ 21, 26-27; *id.* Ex. C at 18-19. The Terms flagged that arbitration clause not once but *twice* for subscribers and in bold type and/or all caps. *See id.* Ex. C at 18-19.

## C. The Arbitration Agreement Covers this Dispute.

The Supreme Court has held that "if a valid [arbitration] agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue," and must compel arbitration. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019). In other words, "the question of *who* should decide arbitrability precedes the question of *whether* a dispute is arbitrable." *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1281 (10th

Cir. 2017). Here, arbitrability issues—including the question of class-wide arbitrability—are delegated to the arbitrator:

> You and The Economist Group further agree that **the arbitrator shall have the exclusive power to rule on his or her own jurisdiction**, **including any objections** with respect to the existence, scope or validity of the arbitration provision or **to the arbitrability of any claim or counterclaim**.

Arnot Decl. Ex. C at 18 (emphasis added). Because the parties unmistakably agreed to "delegate threshold arbitrability questions to the arbitrator," *Henry Schein, Inc.*, 586 U.S. at 69, the Court should not reach or analyze any gateway arbitrability issues to compel individual arbitration. *iGlobal Exports, LLC v. Shoemaker*, No. 4:22-CV-00044-TC-PK, 2022 WL 4257488, at *2 (D. Utah Sept. 15, 2022). The Terms Plaintiff Urrutia accepted could not be clearer: he agreed that the arbitrator has the "exclusive power" to decide on "the arbitrability of any claim or counterclaim." Arnot Decl. Ex. C at 18.[15]

Plaintiff Urrutia's NISNPIA claim unquestionably falls within the Terms' expansive arbitration provision and mandate arbitration. The arbitration clause requires arbitration for:

> **[A]ny dispute, claim, or controversy** between you and The Economist Group **arising in connection with or relating in any way to these Terms or to your relationship with The Economist Group as a user or subscriber** (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory).

---

[15] Furthermore, TEN's Terms expressly incorporate the AAA Rules, which also reserve all questions of arbitrability for the arbitrator. The arbitration provision Plaintiff accepted states "Arbitration…shall be conducted by the American Arbitration Association (AAA) pursuant to the AAA's Consumer Arbitration Rules ("AAA Rules"), then in force." Arnot Decl. Ex. C at 18. The Tenth Circuit has held that this type of invocation of the AAA Rules "showed clear and unmistakable evidence of their intention to delegate questions of arbitrability to the arbitrator." *Dish Network L.L.C. v. Ray*, 900 F.3d 1240, 1245 (10th Cir. 2018)*; see also Inception Mining, Inc. v. Danzig, Ltd.*, No. 2:17-CV-00944-DN, 2018 WL 565716, at *4 (D. Utah Jan. 24, 2018); *iGlobal Exports, LLC*, 2022 WL 4257488, at *2. Plaintiff and TEN clearly agreed to delegate the question of arbitrability to the arbitrator. That delegation obviates the need for this Court to consider the arbitration agreement's enforceability or scope.

*Id.* (emphasis added).   Courts in the Tenth Circuit and this district have recognized that formulations like "arising out of" or "relating to" have an expansive reach on the coverage of claims pursuant to an arbitration agreement.  *See, e.g., Reifenberger v. Autovest* LLC, No. 2:20-CV-571-DAK-JCB, 2021 WL 212237, at *4 (D. Utah Jan. 21, 2021) (agreement that arbitration "applied to any claim, dispute, or controversy arising from or related to the [agreement], the sale of the vehicle, the relationships resulting from the [agreement], and the collection of amounts owed" was broad and required dispute's arbitration); *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 332 (10th Cir. 1993); *Dodson Int'l Parts, Inc. v. Williams Int'l Co. LLC*, 12 F.4th 1212, 1220 (10th Cir. 2021) (citation omitted).

The crux of Plaintiff Urrutia's claim—whether TEN rented out his "private purchase information" to third parties in violation of the NISNPIA, AC ¶ 57, is an action "arising in connection with…these Terms or to [their] relationship with The Economist Group as a user or subscriber," Arnot Decl. Ex. C at 18, and falls in the heart of the broad arbitration provision. This Court should compel individual arbitration of Urrutia's claim and dismiss him from this case.

## CONCLUSION

Defendant TEN respectfully requests that this Court dismiss Plaintiffs' Amended Complaint with prejudice under Fed. R. Civ. P. 12(b)(1) and (6), or, in the alternative, this Court compel arbitration of Plaintiff Urrutia's claim and dismiss him from this action.

Dated: May 20, 2024                                  Respectfully submitted,

> */s/ Milo Steven Marsden*
> Milo Steven Marsden (Utah State Bar No. 4879)
> Maryann Bauhs (Utah State Bar No. 17196)
> **DORSEY & WHITNEY LLP**
> 111 South Main Street, Suite 2100
> Salt Lake City, UT  84111
> Telephone: (801) 933-7360
> Email: marsden.steve@dorsey.com
>              bauhs.maryann@dorsey.com

Sharon L. Schneier (*pro hac vice* pending)
Nimra H. Azmi (*pro hac vice* pending)
**DAVIS WRIGHT TREMAINE LLP**
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel:    (212) 489-8230
Email: sharonschneier@dwt.com
        nimraazmi@dwt.com

Sean Sullivan (*pro hac vice* pending)
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017-2566
Tel.: (213) 633-8644
Email: seansullivan@dwt.com

24