Milo Steven Marsden (Utah State Bar No. 4879)
Maryann Bauhs (Utah State Bar No. 17196)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Email:  marsden.steve@dorsey.com
　　　　bauhs.maryann@dorsey.com

Sharon L. Schneier (*pro hac vice* pending)
Nimra H. Azmi (*pro hac vice* pending)
**DAVIS WRIGHT TREMAINE LLP**
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel:     (212) 489-8230
Email: sharonschneier@dwt.com
　　　　nimraazmi@dwt.com

Sean Sullivan (*pro hac vice* pending)
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017-2566
Tel.: 213.633.8644
Email: seansullivan@dwt.com

*Attorneys for Defendant The Economist Newspaper NA, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| KLAY ANDERSON and JOSE URRUTIA, individually and on behalf of all others similarly situated,<br><br>　　　Plaintiffs,<br>v.<br><br>THE ECONOMIST NEWSPAPER NA, INC.<br><br>　　　Defendant. | **DECLARATION OF NADA ARNOT IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT OR IN THE ALTERNATIVE, COMPEL ARBITRATION OF PLAINTIFF URRUTIA'S CLAIM**<br><br>Case No. 2:23-cv-00878<br><br>The Honorable Howard C. Nielson, Jr. |

I, Nada Arnot, being of lawful age, hereby swear and state as follows:

　　　1.　　I am the Executive Vice President of Marketing at The Economist Newspaper NA, Inc. ("Defendant" or "TEN").  My responsibilities include brand marketing for *The Economist* as well as overseeing global subscriber growth worldwide.

1

2. I make this Declaration in support of Defendant TEN's *Motion to Dismiss or in the Alternative Compel Arbitration and Memorandum in Support* (the "Motion"). All capitalized terms used but not defined herein have the meanings ascribed to such terms in the Motion.

3. I have personal knowledge of TEN's business operations (or lack thereof) in Utah.

4. I also have personal knowledge of TEN's Terms of Use (the "Terms") and Privacy Policy and the procedures by which users agreed to the Terms and Privacy Policy at the time Jose Urrutia subscribed to *The Economist* in April 1, 2023. I have personal knowledge of the records relating to Plaintiff Urrutia's subscriptions and activities as maintained in the ordinary course of TEN's business. My knowledge of TEN's Terms and Personal Privacy is based on personal experience gained during the course of my employment, including through my review of TEN's documents, understanding of its systems, and my communications with others at TEN as part of my work.

5. I am familiar with the facts and statements made in this Declaration, and if asked to testify as to these facts in a court of law, I would do so.

6. Defendant TEN publishes *The Economist* magazine weekly in print and digitally. *The Economist* focuses on current affairs, international business, politics, technology, and culture.

7. TEN is a Delaware corporation with its principal place of business in New York, New York.

8. TEN does not have any offices, bank accounts or employees in Utah.

9. TEN has never owned or operated a place of business in Utah.

10. On information and belief, for some period, the Salt Lake City airport maintained a kiosk on Concourse C that advertised that *The Economist* was available for purchase. According to online records, that kiosk was closed in December 2020. Attached hereto as **Exhibits A** and **B**

are true and correct copies of Wayback Machine captures of the Salt Lake City Airport website dated October 26, 2020 and December 2, 2020 respectively. *Compare* Ex. A[1] *with* Ex. B.[2]

11. TEN did not own or operate that kiosk and has never owned an office or property in the State of Utah.

12. Utah residents who wish to purchase a subscription to *The Economist* can do so online or through an agent. TEN does not have any direct relationship with retailers who sell the publication.

13. TEN has no registered office, no employees and no bank account in the State of Utah.

### A. Plaintiff Jose Urrutia's Subscription Process

14. TEN's records kept in the ordinary course of business show that Mr. Urrutia purchased subscriptions to *The Economist* on three different occasions: November 28, 2015, December 21, 2019, and April 1, 2023. He purchased his latest subscription online. In April 2023, when Mr. Urrutia purchased his most recent subscription, every user who signed up online through TEN's website for a subscription to *The Economist*, including Mr. Urrutia, had to agree to TEN's Terms of Use (the "Terms")[3] and TEN's Privacy Policy[4] that were effective at that time.

15. A true and correct copy of TEN's Terms of Use in effect as of April 2023, which were accepted by Mr. Urrutia, is attached hereto as **Exhibit C.**

16. A true and correct copy of TEN's Privacy Policy in effect as of April 2023, which were acknowledged by Mr. Urrutia, is attached hereto as **Exhibit D.**

17. Mr. Urrutia presently subscribes to *The Economist*.

---

1 https://web.archive.org/web/20201026193432/https:/slcairport.com/dining-and-shopping/
2 https://web.archive.org/web/20201202060226/https:/slcairport.com/dining-and-shopping/
3 https://www.economistgroup.com/terms-of-use-31-march-2023-to-30-june-2023.
4 https://web.archive.org/web/20230401071548/https://www.economistgroup.com/privacy-policy.

18. Records maintained in the ordinary course of business show that Mr. Urrutia purchased a subscription to *The Economist* online by accessing its website at https://subscribenow.economist.com/ (the "Website") in April 2023.

19. At that time (and since) TEN's sign-up process for subscribers required customers to accept the operative Terms of Use and Privacy Policy before completing their purchase of a subscription.

20. To sign up for a subscription to *The Economist* online through the Website in April 2023, a prospective subscriber had to navigate to a check out page on TEN's Website where they were required to fill in their name, address, and billing information. At the bottom of this page, before a customer could click the purple checkout box and start their subscription, they were *required* to acknowledge their assent to TEN's Terms and Conditions and Privacy Policy.

21. A customer like Mr. Urrutia could not proceed with their subscription without affirmatively clicking a checkbox which stated in bold sans serif typeface "**I understand the Terms and Conditions and acknowledge the privacy policy.**" A true and correct copy of this customer sign-up flow for TEN's Website is attached hereto as **Exhibit E.**

22. The phrases "Terms and Conditions" and "privacy policy" were underlined and hyperlinked. If clicked, these hyperlinks directed the user to new TEN webpages containing the respective terms and policy. A customer clicking on the hyperlink "Terms and Conditions" was directed to a webpage with a copy of TEN's April 2023 Terms, which contained the arbitration clause and class action waiver. A customer clicking on the hyperlink "Privacy Policy" was directed to a webpage with a copy of TEN's April 2023 Privacy Policy.

23. After checking their assent to the Terms and Privacy Policy and clicking the checkout button, a subscriber was taken to TEN's confirmation page. The confirmation page included the phrase "**Terms of Cancellation**" in bold and underlined font and hyperlinked to TEN's April 2023 Terms. A true and correct copy of the confirmation page is attached hereto as **Exhibit F.**

4

24. As soon as the subscription to *The Economist* was confirmed, a subscriber, such as Mr. Urrutia, would receive an email from TEN confirming the subscription. The email Mr. Urrutia would have received stated, "Here are the <u>terms and conditions</u> and <u>privacy policy</u> associated with your purchase." TEN's email underlined "<u>terms and conditions</u>" and hyperlinked it to the webpage for the 2022 Terms. TEN's email likewise underlined "<u>privacy policy</u>" and hyperlinked it to the webpage for the 2022 Privacy Policy. Separately, the bottom of the email sent to new subscribers also hyperlinked to the <u>Privacy Policy</u> and <u>Terms and Conditions</u>. A true and correct copy of the confirmation email is attached hereto as **Exhibit G.**

25. Records maintained in the ordinary course of business show that when Mr. Urrutia purchased a subscription to *The Economist* online through TEN's Website in April 2023, he affirmatively clicked his acceptance of the Terms (including the arbitration clause and class action waiver) and Privacy Policy in effect as of that date.

26. In a section of the Terms accepted by Mr. Urrutia titled in bold, **Governing Law; Mandatory Arbitration (and Exceptions); Class Action Waiver; Jurisdiction – U.S. Users and Subscribers Only**, Mr. Urrutia specifically agreed to arbitrate his claims pageainst TEN and to a class action waiver.

27. TEN's arbitration clause prominently sets forth certain critical language in all capital letters and states:

> Mandatory Arbitration. You and The Economist Group agree that any dispute, claim, or controversy between you and The Economist Group arising in connection with or relating in any way to these Terms or to your relationship with The Economist Group as a user or subscriber (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory) will be determined by mandatory binding individual (not class) arbitration. You and The Economist Group further agree that the arbitrator shall have the exclusive power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration provision or to the arbitrability of any claim or counterclaim. Arbitration is more informal than a lawsuit in court. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND COURT REVIEW OF AN

5

ARBITRATION AWARD IS LIMITED. There may be more limited discovery than in court. YOU SPECIFICALLY AGREE THAT YOU ARE BOUND TO RESOLVE ALL DISPUTES IN ARBITRATION, AND YOU ACKNOWLEDGE THAT YOU ARE VOLUNTARILY AND KNOWINGLY FORFEITING YOUR RIGHT TO A TRIAL BY JURY AND TO OTHERWISE PROCEED IN A LAWSUIT IN STATE OR FEDERAL COURT. Arbitration shall be subject to the Federal Arbitration Act and shall be conducted by the American Arbitration Association (AAA) pursuant to the AAA's Consumer Arbitration Rules ("AAA Rules"), then in force. The AAA Rules, as well as instructions on how to file an arbitration proceeding with the AAA, appear at adr.org, or you may call the AAA at 1-800-778-7879.

28.     The class action waiver Mr. Urrutia accepted prominently sets forth certain critical language in all capital letters and states:

No Class or Representative Proceedings; Class Action Waiver. YOU AND THE ECONOMIST GROUP AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION. Unless both you and The Economist Group agree, no arbitrator or judge may consolidate more than one person's claims or otherwise preside over any form of a representative or class proceeding.

29.     Records maintained in the ordinary course also confirm that Mr. Urrutia's information was *not* included in any third-party mail campaigns by *The Economist*.

### B.     Plaintiff Klay Anderson

30.     TEN's records kept in the ordinary course of business show that Mr. Anderson purchased subscriptions to *The Economist* on three different occasions: August 12, 2007, April 25, 2015, and October 19, 2019.  Anderson canceled his subscription to *The Economist* on August 10, 2022 and has not resubscribed to the magazine

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Executed this 20th day of May, 2024 in New York, NY.

By: _____
                    Nada Arnot