Frank S. Hedin (Pro Hac Vice Application Forthcoming)
**HEDIN LLP**
1395 Brickell Avenue, Suite 610
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
fhedin@hedinllp.com

DAVID W. SCOFIELD – 4140
**PETERS | SCOFIELD**
*A Professional Corporation*
7430 Creek Road, Suite 303
Sandy, Utah 84093-6160
Telephone:    (801) 322-2002
Facsimile:    (801) 912-0320
E-Mail:    dws@psplawyers.com

Attorneys for Plaintiffs and the Putative Class

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| KLAY ANDERSON and JOSE URRUTIA, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>THE ECONOMIST NEWSPAPER NA INC.<br>                    Defendant. | **PLAINTIFFS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>  Case No. 2:23-cv-00878-HCN-DAO<br><br>  District Judge Howard C. Nielson, Jr.<br>   Magistrate Judge Daphne A. Oberg |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

THE PERTINENT STATUTORY SCHEME .............................................................. 3

ARGUMENT ..................................................................................................................... 4

    I.    Plaintiff Has Article III Standing, and the Court has Subject-Matter Jurisdiction ............ 4

    II.   NISNPIA's Class Action Bar is Preempted by Rule 23 .................................. 15

    III.  The FAC Plausibly States a Claim for Relief ................................................. 20

        (a)    The NISNPIA Does Not Require That a Defendant Be Domiciled in Utah ............. 20

        (b)    Plaintiff has Plausibly Alleged That TEN Disclosed his Nonpublic Personal Information ........................................................................................ 24

CONCLUSION ................................................................................................................. 26

Plaintiff Klay Anderson files this Opposition to Defendant The Economist Newspaper NA INC.'s ("Defendant" or the "TEN") Motion to Dismiss the Amended Complaint ("the Motion", cited as "Mot.") (ECF No. 21)[1] and states as follows:

## INTRODUCTION

In this putative class action, Plaintiff alleges in the operative First Amended Complaint ("FAC") that TEN rented and sold (for money), exchanged (for other valuable consumer data), and otherwise disclosed for compensation Plaintiff's and all of other Utah subscribers to *The Economist's* nonpublic personal information – including information Defendant had gathered in connection with Plaintiff's subscription – to any third party interested in acquiring it, including data aggregators, data appenders, data cooperatives, aggressive advertisers, and other third parties. The nonpublic personal information Defendant disclosed included Plaintiff's full name, home address, the fact that he subscribed to *The Economist* and details concerning his subscription, as well as myriad other categories of individualized data and demographic information, including his age, income, gender and lifestyle information.  And egregiously, Defendant made these disclosures without providing Plaintiff or any of its other Utah subscribers prior notice that it would do so.  By disclosing Plaintiff's nonpublic personal information to third parties for compensation, without first providing Plaintiff clear and conspicuous notice of these practices (and thus an opportunity not to be subjected to them before he subscribed), Defendant violated Utah's Notice of Intent to Sell Nonpublic Personal Information Act, Utah Code Ann. § 13-37-101, *et. seq*. (the "NISNPIA").

TEN seeks dismissal of the FAC on four grounds: *first*, that the action should be dismissed because Plaintiff and the class lack Article III standing; *second*, that the action should be dismissed because the NISNPIA statute purports to bar class actions; *third,* that the FAC fails to state a claim because  TEN denies it is a "commercial entity" under the NISNPIA statute; and *fourth* and finally, that the FAC does not sufficiently allege that TEN disclosed non-public personal information to

---

[1]    The Motion also seeks in the alternative to compel Plaintiff Jose Urrutia to arbitration. (ECF No. 21 at 14-21).  Plaintiffs stipulate that the Court may drop Plaintiff Jose Urrutia from the action without prejudice to resolve the alternative relief sought by the Motion.

third parties in violation of the NISNPIA statute. All of Defendant's arguments are entirely without merit.

With respect to Article III standing, Defendant's disclosures of Plaintiff's nonpublic personal information concretely harmed the very privacy interests the statute confers on Utah consumers – namely, in preventing unauthorized disclosures of their nonpublic personal information to third parties for compensation and being free from intrusions into one's private affairs and concerns (including personal preferences and purchasing habits). The privacy interests that Defendant's disclosures harmed are well rooted in common law, and NISNPIA's passage reflects the determination of the Utah legislature to protect those interests from infringement. Defendant's infringement of Plaintiff's concrete privacy interests afforded by NISNPIA – in preventing disclosures of their nonpublic information and being free of intrusions into their personal affairs –manifested intangible harm sufficient to satisfy Article III.

Defendant's next argument concerning NISNPIA's class action bar is in derogation of the Supreme Court's precedent in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), which held that state law class action bars like the one in the NISNPIA are preempted before federal courts sitting in diversity. Judge Parrish found just that in a thorough, well-reasoned decision that methodically applied *Shady Grove's* preemption analysis to NISNPIA and, under identical facts, found that because NISNPIA's class action bar "is not part of Utah's framework of substantive rights and remedies," Rule 23 preempts NISNPIA's class action bar and plaintiffs may bring a NISNPIA action as a class action in federal courts. *Curry v. Mrs. Fields Gifts, Inc.*, No. 2:22-cv-00651-JNP-DBP, 2023 WL 6318108, at *1 (D. Utah Sept. 28, 2023) (unpublished). This Court should follow *Curry's* reasoning and similarly find that, under *Shady Grove*, NISNPIA's class action bar is preempted by Rule 23.

Defendant's Rule 12(b)(6) arguments are also meritless and should be rejected. First Defendant argues it is not subject to NISNPIA because it is not domiciled in Utah. The argument is nonsense. The statute does not require that a defendant be domiciled in Utah. Rather, it requires only that a defendant have an office or place of business in Utah and have conducted a consumer

transaction in Utah in the ordinary course of business, both of which the FAC alleges.

Defendant's second 12(b)(6) argument is similarly baseless. Defendant asserts that the FAC inadequately alleges that Defendant disclosed Plaintiff and the Class's nonpublic personal information to third parties. However, the FAC plausibly describes Defendant's disclosure, explaining to whom and for what purpose Defendant disclosed its subscribers' nonpublic personal information.

Plaintiff has Article III standing, the action is cognizable as a class action in federal court, and the FAC plausibly states a claim upon which relief may be granted. Accordingly, the Motion should be denied in its entirety.

## THE PERTINENT STATUTORY SCHEME

Pursuant to the NISNPIA, "[a] commercial entity[2] may not disclose nonpublic personal information[3] that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction[4] if the commercial entity fails to comply with Section 13-37-201." Utah Code Ann. § 13-37-202.

Section 13-37-201, in turn, requires a commercial entity to provide the consumer with notice if "the commercial entity enters into a consumer transaction with that person[,]" "as a result of the consumer transaction . . . the commercial entity obtains nonpublic personal information concerning that person[,] and "the commercial entity intends to or wants the ability to disclose the

---

[2]    A "commercial entity" is a person that "has an office or other place of business located in [Utah]" and "in the ordinary course of business transacts a consumer transaction in [Utah]." *Id.* § 13-37-102(2)(a).

[3]    "Nonpublic personal information" means "information that . . . is not public information" and, "either alone or in conjunction with public information, identifies a person in distinction from other persons." *Id.* § 13-37-102(5)(a). "Nonpublic personal information" expressly includes, *inter alia*, "the purchasing patterns of a person" or "the personal preferences of a person." *Id.* § 13-37-102(5)(b)(iii)-(iv) (emphasis added).

[4]    "Consumer transaction" means, *inter alia*, "a sale, lease, assignment, award by chance, or other written or oral transfer or disposition . . . of[] goods[,] services[,] or other tangible or intangible property, . . . that is initiated or completed in [Utah]." *Id.* § 13-37-102(4)(a)(i) (emphasis added).

3

nonpublic personal information . . . to a third party . . . for compensation," where such compensation "is the primary consideration for the commercial entity disclosing the nonpublic personal information," is "directly related to the commercial entity disclosing the nonpublic personal information," and "is not compensation received by the commercial entity in consideration of a transaction [wherein a third party provides the commercial entity with: "(i) services, including business outsource services; (ii) personal or real property; or (iii) other thing of value"]." *Id.* § 13-37-201(1)(a); § 13-37-201(5). The notice "shall be given before the earlier of . . . the point at which the person is requested to provide the nonpublic personal information[,] or . . . the commercial entity otherwise obtains the nonpublic personal information as a result of the consumer transaction[.]" *Id.* § 13-37-201(2).[5]

By way of the foregoing provisions, which make up the substantive framework of the NISNPIA, the statute protects persons' concrete interests in maintaining the privacy of their nonpublic personal information and in preventing intrusions into their private affairs and concerns caused by disclosures of such information (including information that divulges their purchasing habits and personal preferences).

## ARGUMENT

### I.   **Plaintiff Has Article III Standing, and the Court has Subject-Matter Jurisdiction**

First, Defendant argues that Plaintiff lacks Article III standing to seek redress in federal court. The argument is without merit.

To establish Article III standing, a plaintiff must allege an "irreducible constitutional minimum" of an "injury-in-fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "Injury

---

[5]     The notice required by section 13-37-201 "shall read substantially as follows: 'We may choose to disclose nonpublic personal information about you, the consumer, to a third party for compensation." *Id.* § 13-37-201(3)(a). The notice may be provided either "orally, if the consumer transaction itself is entirely conducted orally[,] or . . . in writing, if the notice is written in dark bold." *Id.* § 13-37-201(3)(b). In either case, the notice "shall be <u>sufficiently conspicuous</u> so that a reasonable person would perceive the notice before providing the nonpublic personal information." *Id.* § 13-37-201(3)(c) (emphasis added).

in fact is a low threshold." *See Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008). It "is not Mount Everest." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (Alito, J.). With respect to the concreteness prong of the injury-in-fact requirement, Defendant's Motion focuses on *Spokeo* which acknowledges the obvious point that "concrete" injuries need not be tangible. *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 340 (2016).

To test whether a statutory right and remedy pass the threshold "constitutional minima" for standing, *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979), "history and the judgment of Congress play important roles." *Spokeo*, 578 U.S. at 340. History and congressional judgment demonstrate that NISNPIA easily satisfies the "constitutional minima" for standing. *Gladstone*, 441 U.S. at 100. First, the right to privacy has been recognized as a basis for a lawsuit in American courts for over a century. Samuel D. Warren & Louis D. Brandeis, *The Right of Privacy*, 4 HARV. L. REV. 193, 198 (1890) (recognizing a "general right to privacy" at common law). Notably, the Supreme Court recently identified "disclosure of private information" and "intrusion upon seclusion" as examples of "concrete, intangible harms" that American courts have long recognized at common law and continue to manifest Article III standing today. *Seale v. Peacock*, 32 F.4th 1011, 1020 (10th Cir. 2022) (quoting *TransUnion*, 141 S. Ct. at 2204).

Second, in enacting NISNPIA, the Utah legislature exercised its judgment to further define the right to encompass consumers' interests in keeping nonpublic personal information private. In strictly regulating compensation-driven disclosures of nonpublic personal information gathered as a result of consumer transactions, NISNPIA created concrete privacy interests in preventing unauthorized disclosures of a person's nonpublic personal information, as well as protecting against intrusions into the person's private affairs and concerns (including his or her personal preferences and purchasing habits, both of which are matters that the "nonpublic personal information" covered by the statute touches upon). *See* Utah Code Ann. § 13-37-201 & § 13-37-102 (prohibiting commercial entities from disclosing any person's "nonpublic personal information," such as "the purchasing patterns of [the] person" or "the personal preferences of [the] person," obtained as a result of the person's purchase of consumer goods from the company,

5

unless the person was first notice specified in section 13-37-201, before transacting with the company); *See* Transcript of Proceedings In Re: HB 40, Utah House of Representatives, 2003 General Session, Feb. 6, 2003, a true and correct copy of which is attached hereto as Exhibit A[6], at 9:14-16 (Rep. Douglas C. Aagard, NISNPIA's sponsor, explaining that statute intends to confer "a right to privacy that an individual deserves" with respect to their nonpublic personal information collected by companies as a result of consumer transactions); *id*. at 14:22-25, 15:1-16 (Rep. Judy Ann Buffmire expressing concern over exploitation of personal information by companies). NISNPIA is thus a distinctly modern privacy right, but as such, it has deep roots in common law.

Decisions addressing Article III standing to redress unauthorized disclosures of personal information in violation of the federal Video Privacy Protection Act ("VPPA") and the Michigan Preservation of Personal Privacy Act ("VRPA") confirm the concreteness of the injuries suffered by Plaintiff here. Like the NISNPIA, both the VPPA and VRPA prohibit sellers of certain goods (written or audio-visual materials) from disclosing records concerning their customers' purchases of those materials to third parties unless customers are provided prior notice of the disclosures. *See* 18 U.S.C. § 2710 (VPPA); M.C.L. § 445.1712 (VRPA). Courts across the country unanimously agree that disclosures of personal information in violation of the VPPA[7] and the

---

[6]    The full audio of the General Session is available at https://le.utah.gov/av/videoClip.jsp?meetingType=floor&stream=https://stream1.utleg.gov/vodhouse/mp4:9893.mp4/playlist.m3u8 (last accessed March 20, 2024). The transcript attached hereto as Exhibit A was prepared by a certified court reporter.

[7]    *Perry v. Cable News Network, Inc*., 854 F.3d 1336 (11th Cir. 2017) (holding that plaintiff "has satisfied the concreteness requirement of Article III standing where the plaintiff alleges a violation of the VPPA for a wrongful disclosure," because "Supreme Court precedent has recognized in the privacy context that an individual has an interest in preventing disclosure of personal information." *Id*. (citing *Reporters Comm. for Freedom of the Press*, 489 U.S. at 762); S*ee also, e.g., Martin v. Meredith Corp.,* 2023 U.S. Dist. LEXIS 27539 (S.D.N.Y. Feb. 17, 2023) (unpublished) (holding that any disclosure of private, VPPA-protected information to a third party without consent is "sufficient to confer standing")*; In re Nickelodeon Consumer Privacy Litig*., 827 F.3d 262, 274 (3d Cir. 2016) (holding that a violation of the VPPA confers Article III standing, because "the harm is … concrete in the sense that it involves a clear de facto injury, i.e., the unlawful disclosure of legally protected information"); *Yershov v. Gannet Satellite Info. Network,*

*Footnote Continued on Next Page*

6

VRPA[8] manifest concrete harm sufficient to satisfy Article III. Just like the plaintiffs in these analogous VPPA and VRPA cases, Plaintiff was deprived of his right not to have his nonpublic personal information disclosed to third parties for compensation absent his informed consent (i.e., without having received the notice required by the statute and thus the ability not to proceed with the transaction), which is enough to satisfy Article III.[9]

---

*Inc.*, 240 F. Supp. 3d 353, 361 (D. Mass. 2016) (holding that consumers alleging a defendant violated the VPPA by "knowingly disclos[ing] their [personally identifiable information] to a third party without their consent have satisfied the concreteness requirement for Article III standing"); *Austin-Spearman v. AMC Network Entm't LLC*, 98 F. Supp. 3d 662, 666 (S.D.N.Y. 2015) ("Notably, every court to have addressed this question has reached the same conclusion, affirming that the VPPA establishes a privacy right sufficient to confer standing through its deprivation").

[8]    *See also Coulter-Owens v. Time, Inc.*, 695 F. App'x 117, 121 (6th Cir. 2017) (unpublished) ("[T]he disclosure of that information is a cognizable injury in fact for purposes of Article III standing."); *Moeller v. Am. Media, Inc.*, 235 F. Supp. 3d 868, 873 (E.D. Mich. 2017) ("[B]ecause the alleged violation of the Michigan [PPPA] here implicates plaintiffs' 'concrete interest' in the nondisclosure of their personal information without their permission, they have adequately pled a concrete injury-in-fact."); *Lin v. Crain Commc'ns Inc.*, 2020 WL 248445, at *6 (E.D. Mich. Jan. 16, 2020) (unpublished) ("The alleged violation of Michigan's PPPA implicates [plaintiff's] 'concrete interest' in the disclosure of his PRI without permission."); *Kinder v. Meredith Corp.*, 2014 WL 4209575, at *4 (E.D. Mich. Aug. 26, 2014) (unpublished) (finding Article III standing existed where plaintiff alleged bare statutory violation of the PPPA); *Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172, 185 (S.D.N.Y. 2017) ("[E]very court to consider the issue of standing under the [PP]PA has concluded that such a violation constitutes a concrete injury in and of itself."); *Halaburda v. Bauer Pub. Co.*, 2013 WL 4012827, at *3-5 (E.D. Mich. Aug. 6, 2013) (unpublished) (disclosure of person's information in violation of the [PPPA] is a cognizable injury-in-fact and confers Article III standing); *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 627-28 (E.D. Mich. 2017) (same). Notably, following the Supreme Court's decision in *Transunion,* courts assessing Article III standing in the PPPA context have continued to consistently hold that a disclosure made in violation of the statute necessarily results in an invasion of privacy that manifests an injury-in-fact sufficient to satisfy Article III. *See Pratt v. KSE Sportsman Media*, *Inc.* 586 F. Supp. 3d 666, 676-677 (E.D. Mich. 2022) (holding that "it is well established that a properly alleged PPPA claim confers Article III standing," and finding that *TransUnion LLC* only "reinforces" that a PPPA plaintiff has Article III standing).

[9]    Defendant's violations of NISNPIA were far more invasive of privacy than violations of other consumer privacy statutes that district courts of the Tenth Circuit (and throughout the country) have routinely found sufficient to confer Article III standing. For instance, if the receipt of an unsolicited phone call is invasive enough to constitute a concrete harm, then the disclosure of consumers' nonpublic personal information to data miners, data aggregators, aggressive

*Footnote Continued on Next Page*

The Supreme Court's recent decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), only further bolsters this conclusion.  In *TransUnion*, it held that the first group of class members – those who had a misleading credit report disseminated to a third party – had suffered a concrete injury, in fact, under Article III.  *Id.* ("In short, the 1,853 class members whose reports were disseminated to third parties suffered a concrete injury in fact under Article III.").  Here, likewise, Plaintiff alleges that his private, nonpublic personal information about his purchases of consumer goods from Defendant was sold by Defendant for profit to numerous third parties (in fact, to anyone interested in purchasing it) without prior notice, let alone consent.  *See* FAC ¶¶ 8-57.  The Supreme Court in TransUnion specifically identified disclosures of private information like those made by Defendant here as examples of intangible harms that have been "traditionally recognized as providing a basis for [a] lawsuit[ ] in American courts."  *See TransUnion LLC*, 594 U.S. at 425 (2021) (citing "disclosure of private information" as a "chief" example of the sort of harm "traditionally recognized as providing a basis for [a] lawsuit[ ] in American courts").

Nevertheless, Defendant argues that "TEN's alleged disclosure of Plaintiffs' name, address, and purchase of The Economist to "data aggregators and appenders," … is not analogous to a historical common law tort—namely, invasion of privacy[]" (Mot. at 13) and asserts that the Tenth Circuit's decision in *Shields v. Pro. Bureau of Collections of Md.*, 55 F.4th 823 (10th Cir. 2022) supports the ill-founded idea that unauthorized disclosures of personal information cannot confer Article III standing unless the disclosures were made to the public at large.  *Shields* is both factually and legally inapposite.  In *Shields*, a lender used a mailing service vendor to communicate with the plaintiff about a debt.  *Id.* at 827.  The plaintiff sued the lender for violating the Fair Debt Collection Practices Act's prohibition on debt collectors "communicating, 'in connection with the

---

marketers, and other third parties surely is as well. *See, e.g., Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191 (10th Cir. 2021) (plaintiff who received unwanted phone call and voicemail message "suffered an injury bearing a 'close relationship' to the tort of intrusion upon seclusion," satisfying Article III's standing requirements); *Wesley v. Snap Fin. LLC*, 339 F.R.D. 277, 295 (D. Utah 2021) (receipt of unwanted telephone calls "sufficiently allege[s] an injury-in-fact for Article III standing); *LaVigne v. First Cmty. Bancshares, Inc.*, 215 F. Supp. 3d 1138, 1147 (D.N.M. 2016) (same).

collection of any debt, with any person' without the consumer's consent or court permission." *Id.* at 828. Applying *TransUnion*, the Tenth Circuit concluded that the plaintiff had failed to show a close relationship between the harm she experienced and the common law tort of "disclosure of private facts" (because the lender only disclosed facts about the debtor's debt to a single third-party, its mailing vendor, as opposed to disclosing those facts "publicly"). Accordingly, it affirmed the district court's dismissal of plaintiff's case for lack of Article III standing. *Id.* Here, by contrast, Plaintiff alleges that Defendant offered to sell Plaintiff's nonpublic personal information on the open market to anyone willing to purchase it and that Defendant sold such information to numerous third parties. Defendant's widespread disclosures of Plaintiff's nonpublic personal information, in this case, to anyone interested in purchasing it –a far cry from the disclosure to a single vendor in *Shields* – are plainly analogous to the common law tort of disclosure of privacy and thus readily satisfy Article III's concreteness test.[10] *See, e.g., Bohnak v. Marsh & McLennan Co.*, 79 F.4th 276, 285-86 (2d Cir. 2023) (concluding that the disclosure of personal information "to unauthorized third parties," rather than to the public at large, has the requisite "close relationship" to the tort of public disclosure of private facts, with the court noting that it did not "stretch to reach this conclusion," because "the intangible harm arising from disclosure of one's [personal information] bears a relationship to an injury with a close historical or common-law analogue," even if it is not "an exact duplicate"); *Masterson v. IMA Fin. Grp., Inc.*, No. 223CV02223HLTADM, 2023 WL 8647157, at *7 (D. Kan. Dec. 14, 2023) (unpublished) (public

---

[10]     Notably, in enacting NISNPIA, the Utah legislature specifically distinguished between disclosures of customers' personal information to disclosing parties' agents and disclosures to unrelated third parties. *See* Utah Code Ann. § 13-37-203 (imposing liability on "commercial entities" who make disclosures in violation of the statute); Utah Code Ann. § 13-37-102(7)(b) (exempting from liability disclosures made to "an affiliate or agent of the commercial entity that obtains nonpublic personal information"). The legislature judged that a disclosure of nonpublic personal information to an agent performing work for the disclosing party, without any compensation paid by the agent in exchange for the information – like the disclosure at issue in *Shields* – works no harm to the consumers' privacy and therefore need not be prohibited by the statute, whereas the sale of information to a third party unrelated to the disclosing party – like all of Defendant's disclosures of Plaintiff's nonpublic personal information at issue in this case – harms consumers' privacy interests and thus deserved to be prohibited by the statute.

disclosure of private facts occurs where personal information is "exposed in a way that would facilitate easy, imminent access" to it).

Notably, while the plaintiff in *Shields* attempted to analogize her harm to the common law tort of "disclosure of private facts," she made no attempt to analogize it to the common law tort of "intrusion upon seclusion" – another "chief" example of an intangible concrete harm "traditionally recognized as providing a basis for [a] lawsuit[ ] in American courts." *TransUnion LLC*, 594 U.S. at 425; *see also Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191 (10th Cir. 2021) ("At common law, courts readily recognized a concrete injury arising from the tort of intrusion upon seclusion—a tort protecting against defendants who intrude into the private solitude of another.") (citing Restatement (Second) of Torts § 652A(2)(a) (1977)).[11] While the Tenth Circuit in *Shields* "rejected a link to the tort of intrusion upon seclusion in a single sentence (without analysis) because the plaintiff never alleged any intrusion in her 'private solitude'," *Salazar v. Nat'l Basketball Ass'n*, No. 1:22-CV-07935 (JLR), 2023 WL 5016968, at *6 (S.D.N.Y. Aug. 7, 2023) (unpublished), in this case Plaintiff has also demonstrated that Defendant's disclosures intruded upon Plaintiff's seclusion.

Indeed, the factual allegations of the FAC adequately show (or at the very least plausibly suggest) that Defendant, in addition to disclosing Plaintiff's private facts (discussed above), intruded upon his private affairs and concerns by selling, to third parties on the open market, Plaintiff's nonpublic personal information that revealed his personal preferences and purchasing habits (information that Defendant gathered as a result of Plaintiff's subscription to *The*

---

[11]      "Intrusion upon seclusion occurs when an individual 'intentionally intrudes, physically or otherwise, upon the solicitude or seclusion of another or his private affairs or concerns ... if the intrusion would be highly offensive to a reasonable person.'" *Salazar*, 2023 WL 5016968, at *5–6 (S.D.N.Y. Aug. 7, 2023) (quoting Restatement (Second) of Torts § 652B (1977)). Notably, an intrusion upon seclusion "does not depend upon any publicity given to the person whose interest is invaded or to his affairs." *Scott v. Hern*, 216 F.3d 897, 917 (10th Cir. 2000). As an example of the injury, the Restatement (Second) highlights an intrusion into someone's privacy "by opening [a plaintiff's] private and personal mail." *Id.* cmt. b. "The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the ... information outlined." *Id.*

*Economist*), all without providing prior notice to Plaintiff, let alone obtaining his consent – practices that a reasonable person would find highly offensive. *See, e.g.,* FAC ¶¶ 1, 5, 7, 55-57,76.[12] Following *TransUnion*, courts have had little difficulty finding common law analogues to the tort of intrusion upon seclusion for purposes of satisfying Article III. *See, e.g., Salazar*, 2023 WL 5016968, at * 6 (S.D.N.Y. Aug. 7, 2023) ("Plaintiff's claim that Defendant purposefully shared his private viewing information with a third party without Plaintiff's knowledge or consent is akin to" an "intrusion . . . upon [her] private affairs or concerns" that "would be highly offensive to a reasonable person"); *Feldman v. Star Trib. Media Co. LLC*, 659 F.Supp.3d 1056 (D. Minn. 2023) (defendant website operator's disclosures of plaintiff's private video viewing history with Facebook found analogous to the tort of intrusion of seclusion).[13] Thus, regardless of whether

---

[12]    While Plaintiff's allegations do not parrot the legal elements for the tort of intrusion upon seclusion – i.e., that "Defendant intruded upon his private affairs in a way that would be highly offensive to a reasonable person" – the FAC contains many factual allegations concerning Defendant's disclosure practices from which it may be reasonably inferred that Defendant's disclosures of Plaintiff's nonpublic personal information to third parties for compensation was intrusive of Plaintiff's private affairs or concerns (specifically, his private "purchasing habits" and "personal preferences," both of which are specifically identified in the statute as the sort of nonpublic personal information that deserves protection from disclosure), and that those disclosures would be highly offensive to a reasonable person (*see, e.g.,* FAC ¶¶ 1 & 39 (alleging that, "as a result of" Defendant's disclosures, "Plaintiffs have received a barrage of unwanted junk mail," causing "waste and inconvenience" and increasing their exposure to "fraudulent sweepstakes, charities, and buying clubs.") & ¶ 54 ("As a result of TEN's data compiling and sharing practices, companies can purchase, rent, exchange for, or otherwise obtain customer lists from TEN that identify TEN's customers by their most intimate details, including their personal preference and purchasing habits"). *See, e.g., Salazar*, 2023 WL 5016968, at *6 (rejecting argument from the defendant "that a comparison to the tort of intrusion upon seclusion is inappropriate because Plaintiff failed to plead that the conduct in question would be 'highly offensive to a reasonable person,' explaining that, at the pleading stage, Plaintiff has set forth enough to allege that was offensive to a reasonable person" based upon factual allegations similar to those found in the FAC here) (citing *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presume that general allegations embrace those specific facts that are necessary to support the claim.'" (quotation marks and alteration omitted)).

[13]    Notably, the defendant in *Feldman* cited to *Shields* in support of its argument that any disclosures it made were not "public" and were thus incapable of manifesting a concrete injury for

*Footnote Continued on Next Page*

Defendant's sales of Plaintiff's nonpublic personal information to the innumerable third parties described in the FAC can be said to constitute "public" disclosures of that information or not, those disclosures nonetheless revealed Plaintiff's "purchasing habits" and "personal preferences," among other things, thereby intruding upon Plaintiff's private affairs in a way that would be highly offensive to a reasonable person (and certainly to the Utah legislature).

According to Defendant, its nonconsensual sales of Plaintiff's nonpublic purchase information caused only "informational injury."  (Mot. at 13 (citing *Laufer*, 22 F.4th at 880-81 & *TransUnion*, 596 U.S. at 415)).  This, too, misses the mark.  The proper focus of the Article III standing inquiry is the harm caused by Defendant's nonconsensual disclosures of Plaintiff's nonpublic personal information to third parties for compensation – the conduct giving rise to liability under the statute and which, as discussed above, in and of itself infringed upon Plaintiff's concrete, NISPIA-conferred right to keep such information private.  *See Eichenberger v. ESPN, Inc.,* 876. F.3d 979, 983084 (9th Cir. 2017) (holding that the privacy right the VPPA protects is infringed upon "any time a video service provider discloses otherwise private information," such that any further "showing [of] consequential harm" is unnecessary to establish Article III standing and noting that "privacy torts do not always require additional consequences to be actionable").[14]

To be sure, Defendant's failure to provide Plaintiff with the notice specified in §13-37-201

---

purposes of Article III. The argument was rejected. *Feldman v. Star Tribune Media Co. LLC,* Dkt. 19 at 16-17 (making the argument); *Feldman,* 2023 U.S. Dist. LEXIS 37416, at *5-15 (finding standing under the VPPA).

[14]    Although Plaintiff need not allege any additional "downstream" or "consequential" harms they suffered as a result of Defendant's disclosures (above and beyond the harms to his concrete privacy interests, discussed above) to establish their Article III standing, he has nonetheless alleged that, "as a result" of Defendant's disclosures of their nonpublic personal information, they have each "received a barrage of unwanted junk mail" (FAC ¶ 1), which causes "waste and inconvenience" and increases their exposure to "fraudulent sweepstakes, charities, and buying clubs" (*see id.* ¶ 104).  Against this backdrop, there is nothing speculative or conclusory about Plaintiff's allegations that Defendant's disclosures of his nonpublic personal information, made to a laundry list of data traffickers and advertisers, resulted in a "barrage of unwanted junk mail" at their homes.  These allegations, although unnecessary to establish Plaintiff's Article III standing, nonetheless establish an additional concrete harm caused by Defendant's NISNPIA-violative conduct.

before he decided to subscribe to *the Economist*, which Defendant fixates on in the Motion, is what rendered Defendant's subsequent disclosures of Plaintiff's nonpublic personal information nonconsensual, because the failure to provide the notice deprived Plaintiff of the option to forgo purchasing Defendant's goods (and thus avoid providing nonpublic personal information to Defendant for it to disclose). *See* Ex. A at 9:20-21 (Rep. Aagard, NISNPIA's sponsor, explaining that the statute ensures that "the consumer will be informed" about a company's nonpublic personal information-disclosure practices before transacting with it, and "the consumer will have a choice" not to transact with the company if he or she wants to avoid having such information disclosed for compensation); *id.* at 13:9-17 (Rep. Aagard explained, "my intent on this is, if I go into a store and I see that notice that they're going to sell my information, then I would need to make a choice as to whether I want to conduct a transaction with that business or go elsewhere. . . I want it to be the consumer choice."); *id.* at 13:20-23 (Rep. Wayne Harper stated that "[t]he notice is an essential part of what needs to be done to help the residents of the state of Utah and elsewhere to understand the choices they make, to have informed choices."). If an individual knowingly subjected himself or herself to Defendant's practices of selling customers' nonpublic personal information by purchasing Defendant's goods after receiving the notice specified in section 13-37-201, it would be hard to deny that the individual had consented to the subsequent disclosure of that information. *See, e.g., Santana v. Take–Two Interactive Software, Inc.*, 717 F. Appx. 12, No. 17-303, 2017 WL 5592589 (2d Cir. Nov. 21, 2017) (unpublished) (plaintiffs lacked Article III standing to complain about defendant's collection of their biometric data while playing a video game where they received notice before playing the game that defendant would collect their biometric data if they played the game). The greatest evil occurs when privacy-invading companies like Defendant obtain an individual's non-public personal information and then traffic that information to third parties on the open market without having provided prior notice to (much less obtained informed consent from) the individual, as happened here. Thus, even when viewed in the "informational injury" context, Defendant's failure to provide Plaintiff the notice specified in 13-37-201 worked concrete harm to their substantive, statutorily conferred interests in keeping

their nonpublic personal information private and preventing intrusions into their personal affairs (including their personal preferences and purchasing habits). *See Robertson v. Allied Solutions*, 902 F.3d 690, 697 (7th Cir. 2018).[15]

Defendant failed to provide Plaintiff the notice specified in Section 13-37-201 before he subscribed to the *Economist* made their purchases (and thus before Defendant obtained the nonpublic personal information at issue), and therefore lacked Plaintiff's consent, implied or otherwise, to thereafter disclose his nonpublic personal information to third parties for compensation. And by doing so anyway, Defendant directly infringed Plaintiff's concrete, NISNPIA-conferred right to keep that personal information private.

The Utah legislature has it right. The practice Defendant is alleged to have engaged in is offensive to reasonable expectations of privacy. The statute should not be held unenforceable for lack of a concrete injury in the most compelling case for its application.

Plaintiff has Article III standing, and the Court has subject-matter jurisdiction. The Motion should be denied.[16]

*[SPACE LEFT INTENTIONALLY BLANK]*

---

[15]     Also instructive is *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617 (7th Cir. 2020), which addressed a plaintiff's Article III standing to bring a claim for violation of the Illinois Biometric Information Privacy Act ("BIPA") based upon defendant's alleged unauthorized collection of the plaintiff's fingerprint when she made a purchase from one of defendant's vending machines. There the Court noted that defendant's failure to notify the plaintiff of how it would use her biometric data, who would have access to it, and for how long it would be retained *before* defendant collected plaintiff's biometrics stripped the plaintiff of the ability to fully consider the risks attendant to participating in a biometric transaction and to make an informed choice as a consumer, which the Court found constituted an injury in fact. *Id.* at 626.

[16]     In the unlikely event the Court finds that Plaintiff has failed to adequately allege facts that plausibly establish a concrete injury sufficient to satisfy Article III, Plaintiff respectfully request leave to amend their complaint to allege additional facts concerning his injuries.

14

## II.     NISNPIA's Class Action Bar is Preempted by Rule 23

Section 203(3) of the NISNPIA provides that "a person may not bring a class action under this chapter."  Utah Code Ann. § 13-37-203(3).[17]  Under *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 130 S. Ct. 1431, 176 L. Ed. 2d 311 (2010) (cited herein as "*Shady Grove*") state law class action bars like the one in NISNPIA are preempted before federal courts sitting in diversity unless preemption would abridge, enlarge, or modify state law rights or remedies.  *Id.*

Defendant argues that NISNPIA's class action bar applies here and that, consequently, the court lacks subject matter jurisdiction.  In a thorough, well-reasoned and nuanced decision in *Curry v. Mrs. Fields Gifts, Inc.*, No. 222CV00651JNPDBP, 2023 WL 6318108, at *1 (D. Utah Sept. 28, 2023) (unpublished), Judge Parrish considered the same argument Defendant makes for dismissal and the authorities cited in support and determined that Rule 23 preempts NISNPIA's class action bar and that NISNPIA actions like this one are cognizable as class actions in federal courts.  This Court should follow suit.

---

[17]**13-37-203.  Liability.**

(1) A person may bring an action against a commercial entity in a court of competent jurisdiction in this state if:

   (a) the commercial entity enters into a consumer transaction with that person;

   (b) as a result of the consumer transaction described in Subsection (1)(a), the commercial entity obtains nonpublic personal information concerning that person; and

   (c) the commercial entity violates this chapter.

(2) In an action brought under Subsection (1), a commercial entity that violates this chapter is liable to the person who brings the action for:

   (a) $500 for each time the commercial entity fails to provide the notice required by this section in relation to the nonpublic personal information of the person who brings the action; and

   (b) court costs.

(3) A person may not bring a class action under this chapter.

15

In *Shady Grove*, Justice Stevens, in concurrence, set forth a two-step analysis to evaluate the preemption of a New York statutory provision restricting class actions in a diversity action in federal court.[18] Step one considers whether the applicable Federal Rule of Civil Procedure – here Rule 23 – and the state rule at issue – here Section 203(3)'s class action bar – are "reconcilable," *Stender v. Archstone-Smith Operating Tr.*, 958 F.3d 938, 947 (10th Cir. 2020) or, stated differently, whether the federal rule and state statue are in "direct collision." *Shady Grove*, 559 U.S. at 421. Step two considers whether there is direct collision between the federal procedural rule and the state statutory provision. If so, application of the federal procedural rule would pose a Rules Enabling Act problem, meaning that the application of the federal procedural rule would "effectively abridge[], enlarge[], or modif[y] a state-created right or remedy". *Id.* at 422. Justice Stevens explicitly recognized that as to this second step, "the bar for finding an Enabling Act problem is a high one" and reiterated that "[t]he mere possibility that a federal rule would alter a state-created right is not sufficient. There must be little doubt." *Id.* at 432, (Stevens, J., concurring). "[S]ome effect on the outcome of litigation" is insufficient. *Id.* at 433 (Stevens, J., concurring).

Faithfully applying this two-step approach, in *Curry,* Judge Parrish found at Step 1 that "[b]y their plain text, Rule 23 and § 203(3) are in direct, unavoidable conflict. Under the former, a class action "may be maintained." Fed. R. Civ. P. 23(b). Under the latter, a class action "may *not*" be brought by a person. Utah Code Ann. 13-37-203(3) (emphasis added)."[19] *Curry,* WL 6318108, at *2 (D. Utah Sept. 28, 2023).

---

[18]    The Tenth Circuit has held that Justice Stevens' *Shady Grove* concurrence is controlling. *Stender v. Archstone-Smith Operating Tr.*, 958 F.3d 938, 947 (10th Cir. 2020).

[19]    Here, there is no dispute between the parties that Rule 23 and Section 203(3) are in direct conflict. Defendant limits its argument to Step 2 of the *Shady Grove* analysis. (Mot. at 9). Nonetheless, Defendant cites *Fullmer v. A-1 Collection Agency, LLC*, No. 4:20-CV-00143-DN-PK, 2022 WL 1538675, at *3 (D. Utah May 16, 2022) which found Rule 23 was permissive because it uses the word "may" in the phrase "may be maintained." However, as Judge Parrish correctly noted in *Curry*, *Shady Grove's* majority holding forecloses that reading by describing Rule 23 as creating a categorical – as opposed to permissive – right for plaintiffs in federal court. *Curry*, 2023 WL 6318108, at *4 (D. Utah Sept. 28, 2023) ("First, Part IIA [of the *Shady Grove*

*Footnote Continued on Next Page*

Judge Parrish's *Shady Grove* step two analysis recognized that the inquiry looks "to the state statute at issue to differentiate between rights and remedies on the one hand, and procedures on the other, to ensure that Rule 23 does not overstep the boundaries of the Rules Enabling Act or interfere with states' ability to determine the "dimensions" of a state-created claim." *Curry*, 2023 WL 6318108, at *6 (D. Utah Sept. 28, 2023) citing *Shady Grove*, 559 at 429 (Stevens, J. concurring).  Judge Parrish's second step analysis was purely textual and is as follows:

> "This issue can be resolved by reference to the relevant statutory "text and context" alone.  [*Shady Grove*] at 429 (Stevens, J., concurring).  Utah's NISNPIA, including § 203, labeled "Liability," at issue here, is cleanly divisible into rights, remedies, and procedures. Surgical removal of the presumptively procedural class-action bar leaves the rights and remedies otherwise provided by the Act totally intact.

> In fact, § 203 itself is comprised of three subsections that neatly track these three categories: the first defines the dimensions of the claim and cause of action; the second defines the remedies available to litigants under the Act; and the third, of particular concern in this case, is a matter of procedure. At one greater degree of detail, § 203 is mapped out as follows: § 203(1), together with §§ 201 and 202, including by reference to definitions provided under § 102, provide the *cause of action*—that is, the claim or right. Section 203(1)(a)-(c) thereby outlines the "operative group of facts" that must be pleaded in order to give rise to a basis for suing, *Cause of Action*, BLACK'S LAW DICTIONARY(11th ed. 2019), and thus "defines the dimensions of [the] state-created claim." *Shady Grove*, 559 U.S. at 429, 130 S.Ct. 1431 (Stevens, J., concurring) (cleaned up).

> Section 203(2), in turn, creates the applicable remedy by defining what "a court can do for a litigant who has been wronged," *Remedy*, Black's Law Dictionary (11th ed. 2019), by creating liability for violating commercial entities amounting to $500 "for each time the commercial entity fails to provide the notice required by this section in relation to the nonpublic personal information of the person who brings the action," along with court costs. UTAH CODE ANN. 13-37-203(2)(a)-(b).

> Section 203(3), however, is neither a statement of rights nor one of remedies. It neither dictates what must be pleaded or proved as a cause of action, nor does it determine what a plaintiff *gets* should he prevail on such a claim. Instead, § 203(3)

---

decision], which binds this court as to Step One, leaves no doubt that Rule 23 is not permissive in the sense that Defendant contends."); *see also Shady Grove*, 559 U.S. at 398 (2010).

is entirely a matter of procedure, merely going to the preferred means of joinder and aggregation: "a classically procedural calibration of making it easier to litigate claims in [Utah] courts ... only when it is necessary to do so, and not making it too easy when the class tool is not required." *Shady Grove*, 559 U.S. at 435, 130 S.Ct. 1431 (Stevens, J., concurring). Utah has calibrated the ease of aggregating claims under NISNPIA one way through regulation of its state courts under the Act, and Congress has elected another calibration through Rule 23 in the government of federal courts. In both cases, however, the class action remains a quintessentially procedural claims-processing device and, in the specific case of NISNPIA, is separable from any elements of Utah's "framework of substantive rights and remedies," *id.* at 419, 130 S.Ct. 1431 (Stevens, J., concurring), otherwise provided under that Act. […]

Of course, the availability of the procedural mechanism of the class action has "some effect on the outcome of litigation," *id.* at 433, 130 S.Ct. 1431 (Stevens, J., concurring), as Defendant wishes to emphasize. ... Given the feasibility of disentangling the procedural class-action bar from the rest of the Utah statute, while leaving the rights and remedies provided therein intact, this court finds that the "high" bar of finding a Rules Enabling Act violation has not been cleared. *Id.* (Stevens, J., concurring).

*Curry* parses the statute's text to answer the fundamental question of whether Section 203(3)'s class action bar is a procedural rule or a substantive component of rights and remedies under the statute. It is plainly procedural. Other cases are in accord with the approach.[20]

Defendant addresses *Curry's* reasoning only in part of a footnote, calling it formalistic and asserting that it ignores the "fundamental legislative intent." (Mot. at fn. 5). The criticism misses the mark.

Defendant extrapolates entirely from the following statement by Rep. Aagard (Mot. at 15), the bill's sponsor, that Section 203(3)'s class action bar implicates substantive rights and remedies:

---

[20]    *See e.g., In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145, 156 (E.D.N.Y. 2018) ("Here, Hawaii's law regulates only when private plaintiffs can litigate the case. It does not alter the substantive elements of plaintiffs' claims. Most importantly, it is surely no more substantive than the statute at issue in *Shady Grove*, which barred class action suits for an entire category of claims."); *Los Lobos Renewable Power, LLC v. Americulture, Inc*, 885 F.3d 659, 670 (10th Cir. 2018) (quoting *Shady Grove*, 559 U.S. at 408 (Scalia, J., plurality opinion) ("The New Mexico [anti-SLAPP] statute does not alter the rules of decision by which a court will adjudicate the merits of the complaint. The statute "alter[s] only how the claims are processed.")).

"I've purposely limited penalties just to avoid, uh, to take care of any unintended consequences. So I think we're fine." (Ex. A. at 10:18-20).

But Defendant's self-serving speculation is just that. The above comment was not made about the possibility of class actions being brought under the statute, does not mention the class action bar, and certainly bears no indicia of being "part and parcel of a purposeful policy choice…like potentially ruinous liability for millions of dollars through a mass claim." (Mot. at 15).

Justice Stevens' concurrence counsels caution when relying on legislative history to determine the bounds of procedure versus substance. He disagreed that the statute's legislative history was sufficiently clear, *e.g.*, that there was "little doubt" (*Id.* at 432) that the class action bar was substantive, stating:

> The legislative history, moreover, does not clearly describe a judgment that § 901(b) would operate as a limitation on New York's statutory damages. In evaluating that legislative history, it is necessary to distinguish between procedural rules adopted for *some* policy reason and seemingly procedural rules that are intimately bound up in the scope of a substantive right or remedy. Although almost every rule is adopted for some reason and has some effect on the outcome of litigation, not every state rule "defines the dimensions of [a] claim itself[.]"…

*Id.* at 434 (Stevens, J. concurring) (internal citations omitted).[21]

Defendant does not heed that counsel and launches headlong into speculation concerning the "fundamental legislative intent" to be gleaned from Rep. Aagard's remark. This is a far cry from leaving "little doubt" concerning the purpose of Section 203(3)'s class action bar.

The force of Judge Parrish's reasoning is undeniable. Indeed, if 5,000 members of a potential class action were all entitled to statutory damages under Section 113-37-203, the scope of Defendant's liability would not be changed one bit if the actions were brought individually as opposed to on a class action. Section 203 is plainly a severable claims processing rule applicable in Utah state court but with no effect before this Court. There is simply no reason to conclude that

---

[21]    Justice Scalia, for the plurality deemed Section 901's legislative history "pretty sparse" evidence of the New York legislature's intent and basically dismissed it altogether. *See Id.* at 403 (Scalia, J. plurality opinion).

the decision to include a class action bar reflected a legislative judgment on the scope of the rights or remedies conferred under the statute, much less sufficient justification to clear the high hurdle of finding a Rules Enabling Act problem.[22]  Defendant offers no good reason for why the Court should find otherwise; accordingly, the Motion should be denied.

## III.    The FAC Plausibly States a Claim for Relief

TEN contends that the FAC fails to state a claim because (i) the FAC does not plead TEN is domiciled in Utah, and (ii) the FAC inadequately pleads disclosure of subscribers' nonpublic personal information.  Both arguments are meritless.

### (a) The NISNPIA Does Not Require That a Defendant Be Domiciled in Utah

TEN asserts it is "not a commercial entity domiciled in Utah" and thus not subject to NISNPIA.  (Mot. at 17).  NISNIPA's "commercial entity" definition does not require that a company be "domiciled in Utah."  Rather, by its plain terms, the statute's "commercial entity" definition merely requires that Defendant have "an office or other place of business located in [Utah]; and (ii) in the ordinary course of business transacts a consumer transaction in [Utah]." Utah Code Ann. § 13-37-102(2)(a).

The FAC specifically alleges facts supporting the statute's "office" and "transaction" requirements.  It states in relevant part:

> Defendant The Economist Newspaper NA, Inc. is a Delaware corporation that maintains its headquarters and principal place of business in New York, New York and a place of business in Utah at Terminal C of the Salt Lake International Airport, located at 776 N Terminal Dr, Salt Lake City, Utah 84122.   TEN does business throughout Utah and the entire United States.  (FAC ¶ 18)

---

[22]    Defendant cites *Murtagh v. Bed Bath & Beyond Inc.*, No. 19-CV-03487-CMA-NYW, 2020 WL 4195126, at *7 (D. Colo. July 3, 2020), *report and recommendation adopted*, No. 19-CV-03487-CMA-NYW, 2020 WL 4193553 (D. Colo. July 21, 2020) and *Friedman v. Dollar Thrifty Automotive Group, Inc.*, No. 12-cv-02432-WYD-KMT, 2015 WL 8479746 (D. Colo. Dec. 10, 2015) (Mot. at fn. 5) both of which applied a class action bar from Colorado's Consumer Protection Statute.  Respectfully, neither of these cases thoroughly examined, as Judge Parrish did in *Curry*, whether the class action bar was a procedural mechanism capable of being severed without impacting the balance of the statute's rights and remedies.  Rather, these cases uncritically labeled the class action bar part of the framework of the statute's substantive rights and remedies.

It further alleges that Plaintiff Anderson was "a resident of and physically present in Utah" when he "purchased subscriptions to *The Economist* newspaper from Defendant" (FAC ¶ 9, *see also* ¶ 20), *e.g.*, when he transacted business with TEN. There can be no serious debate about whether the FAC alleges facts that support TEN is a "commercial entity" under the NISNPIA statute. It plainly does.

The Court is obligated to accept the FAC's allegations as true and construe them in the light most favorable to the plaintiff. *See Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir. 1995). Moreover, Plaintiff need not describe "every fact in specific detail[,]" *Hamilton v. Angerhofer*, No. 2:15-CV-344 DB, 2017 WL 935885, at *1 (D. Utah Mar. 8, 2017), but only "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007). Here, Plaintiff's allegation that TEN has an office in Utah, that it does business in Utah, and specifically that it did business in Utah with respect to the sale of Plaintiff's subscription plausibly support that TEN is a "commercial entity" under Section 13-37-102(2)(a).

TEN invites the Court to rewrite the statute to add a third "domicile" requirement based on a two-line exchange between a legislator and the NISNPIA's sponsor, Rep. Aagard, discussing a non-final version of the bill wherein Rep. Aagard stated that the NISNPIA applies to companies domiciled in Utah as opposed to "national companies."[23] (Mot. at 17). The argument is meritless. First, a statute's legislative history is only relevant if the Court finds that the statute is ambiguous on its face. *See Phillips Petroleum Co. v. Lujan*, 4 F.3d 858, 861 (10th Cir. 1993) ("The best evidence of Congressional intent is the text of the statute itself and where the language is unambiguous, our inquiry is complete.") *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1227

---

[23]    The audio to which TEN cites is transcribed at Exhibit A. The discussion concerned a non-final version of the bill. Aside from the fact that the final version of the statute did not include any requirement that company be domiciled in the Utah to be subject to liability, the discussed effective date was May 5, 2003. This was met with concern that businesses would not have enough time to become compliant. (Ex. A at 7:12-20). Legislators went back to the drawing board on this issue, among others, as the final version of the bill had an effective date of January 1, 2004. *See* Utah Code Ann. § 13-37-202(1)

(10th Cir. 2017); *Zilleruelo v. Commodity Transporters, Inc.*, 2022 UT 1, ¶¶ 31-32, 506 P.3d 509, 515 (internal citations and quotations omitted) ("it is elementary that we do not seek guidance from legislative history and relevant policy considerations when the [language of the] statute is clear and unambiguous…[Where language is unambiguous] [t]his language must then "be held to mean what it expresses," and any legislative signals … perceive[d] to support [another] interpretation "must yield to the clear and unmistakable language of the [statute].").  Here, the NISNPIA statute could not be clearer – the "commercial entity" requirement does not have a "domiciled in Utah" component on its face and hence the Court need not look to legislative history. Second, TEN's contention is untenable because it seeks to undermine the statute's plain language based on cherry-picked statements concerning the notion of domicile, a concept that, if it factored into the statute's design at all, was obviously left behind in the legislative process.  The plain statutory text must control, and the Court is bound to apply the statute as passed, not as it may have been contemplated at some earlier point in time.  *See Zilleruleo*, 2022 UT 1, ¶ 34, 506 P.3d 509, 515–16 (citation omitted) ("statements of individual legislators 'should not be entitled to any weight' when the statements contradict the plain language of a statute."). This Court should decline TEN's invitation to second-guess the judgment of the Utah legislature by reading an unwritten "domiciled in Utah" requirement into the NISNPIA.

    TEN also makes an irrelevant (and, at this stage, improper) denial that the office or place of business which the FAC pleads TEN maintained in Utah, located at the Salt Lake City airport (FAC, ¶ 18), was "owned or operated by TEN."[24]  But as "[a] defendant's 'mere denial' of the plaintiff's allegations has no bearing on the Court's ruling on a motion to dismiss under Rule

---

[24]    The Court should disregard the Arnot Declaration (Mot., Ex. A) and its supporting exhibits which Defendant submits in support of the Motion.  Matters from outside of the four corners of the Complaint which should not be considered on a motion to dismiss." *Jojola v. Chavez*, 55 F.3d at 494 (citing *Doyle v. Oklahoma Bar Assn.*, 998 F.2d 1559, 1566 (10th Cir. 1993)). ("In determining whether to grant a motion to dismiss, the court is limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint.")

12(b)(6)[,]" TEN's denial is of no moment.  *Kruse v. Travelers Home & Marine Ins. Co.*, No. 15-CV-0444-CVE-FHM, 2015 WL 8347203, at *1 (N.D. Okla. Dec. 8, 2015) (internal quotation omitted).  TEN further requests that the Court take judicial notice that the Salt Lake City airport concourse in which the FAC pleads TEN maintained its place of business or office was closed since fall 2020.  (Mot. at 18).  This is also improper at this stage.  Whether TEN had an office or place in business in Utah such that it should be subject to NISNPIA liability is not a fact subject to judicial notice as it is not a matter "generally known within the trial court's jurisdiction."  *See Abady v. Lipocine Inc.*, No. 2:19-CV-00906, 2023 WL 2933080, at *2 (D. Utah Apr. 13, 2023). Further, even if the Court were to take judicial notice of the fact that Concourse C of the Salt Lake City Airport was closed "since at least December 2020," such notice is of no moment because the Court is bound to accept as true that TEN had an office or place of business in Concourse C during the relevant statutory period, which Plaintiff submits is three years from the filing of the Class Action Complaint, December 5, 2023.[25]  Utah Code Ann. § 78B-305(4).  The FAC's well pled allegations plausibly establish that TEN is subject to the NISNPIA.  While TEN will have the opportunity to make a contrary showing through discovery, it cannot obtain dismissal of the FAC based on denials and unpled facts.  Accordingly, the Motion should be denied.

---

[25]     Defendant bases its request for judicial notice on a news article and a website.  (Mot. at fn. 7, fn. 8).  However, such notice is effective only to establish what was in the public realm at the time, not the truth of the contents of the article.  *See Hampton v. Root9b Tech., Inc.*, Civ. Action No. 15-cv-02152-MSK-MEH, 2016 WL 7868823 at *4 (D. Colo. Aug. 5, 2016) (unpublished) ("When a court takes judicial notice of publications like websites and newspaper articles, the court merely notices what was in the public realm at the time, not whether the contents of those articles were in fact true.") (citations omitted).  As such, the Court cannot conclusively find that Terminal C of the Salt Lake City Airport was closed in December 2020 and even if could, for the reasons stated above, the fact has no bearing on the adjudication of the instant Motion.

**(b) Plaintiff has Plausibly Alleged That TEN Disclosed his Nonpublic Personal Information**

Defendant asserts that the FAC's allegations concerning its disclosure of Plaintiff's information to third parties are "boilerplate," "generic," and "threadbare." (Mot. at 18-19). Defendant's characterizations and argument for dismissal on this ground are baseless. First, the FAC includes numerous allegations concerning Defendant's dissemination without prior notice of Plaintiff's and the class's nonpublic personal information that Defendant obtained through commercial transactions with its Utah subscribers. Specifically, the FAC details the types of organizations to whom Defendant disclosed Plaintiff's and the class's personal information in violation of NISNPIA and each of their respective interests in obtaining this nonpublic information – data aggregators, data appenders, data cooperatives, aggressive advertisers, list brokers, political organizations, non-profit companies, consumer-facing businesses, and other third parties seeking to contact TEN's customers for their own independent business purposes. (FAC, ¶ 1, ¶ 5, ¶ 12, ¶¶ 50-51, ¶¶ 69-72, ¶ 74). Defendant lacks any authority whatsoever for its argument that Plaintiff has not met Rule 8's pleading standard for not identifying specific third parties to whom Defendant disclosed its subscribers' nonpublic personal information when it has identified the exact conduct that gives rise to Plaintiff's claim – the disclosure of Plaintiff's and the class's nonpublic personal information without prior notice to third parties for compensation – and the legal basis for relief, the NISNPIA statute. Plaintiff has easily met Rule 8's requirements and cannot be reasonably expected to know, at this stage, the ins and outs of all of Defendant's illegal practices. *See PHL Variable Ins. Co. v. Sheldon Hathaway Fam. Ins. Tr. ex rel. Hathaway*, No. 2:10-CV-67, 2011 WL 703839, at *2 (D. Utah Feb. 20, 2011) (unpublished) (the facts alleged in the complaint need only "be specific enough to put the defendant on notice of the conduct alleged given the context of the sort of case before the court."). Ultimately, the discovery process will reveal all counterparties to Defendant's alleged NISNPIA violations. Still, at present, Defendant is sufficiently on notice of the basis of Plaintiff's entitlement to relief, and this is grounds alone for the motion to be denied. *See Curry*, 2023 WL 6318108, at *9 (D. Utah Sept. 28, 2023) (finding

based on identical allegations that "Plaintiffs plead unauthorized disclosure under NISNPIA sufficient to support a cause of action at this stage. If Defendant seeks to dispute these factual allegations, they will have ample opportunity to do so at later stages of this litigation."); *Huggins v. Hilton*, 180 F. App'x 814, 816 (10th Cir. 2006) ("[T]he simplified notice pleading standard merely represents the first step in a system adopted to focus litigation on the merits of a claim.").

Second, the FAC goes further still, including documented evidence of Defendant's offer for rent via list broker NextMark, Inc. of *The Economist* subscribers' nonpublic personal information. Defendant asserts that it is speculative to conclude that Plaintiff's information was included on the lists offered for sale or rent by NextMark. (Mot. at 19). However, other courts have found allegations that NextMark offered for rent or sale consumers' nonpublic information supplied by NextMark to the defendant sufficient to state a claim under privacy laws analogous to the NISNPIA.[26]

Here, Plaintiff alleges that Defendant disclosed to third parties for compensation his and all of its other Utah subscribers' non-public information without prior notice and provides the NextMark datacard as an example of this practice. Plaintiff has asserted facts that plausibly give

---

[26]    For example, in *Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682 (W.D. Mich. 2018) the Court found that the plaintiff's inclusion of an offer for sale of Defendant's nonpublic customer information by NextMark passed the "threshold of plausibility" that defendant's disclosure occurred in violation of Michigan's VRPA. *See also Gaines v. Nat'l Wildlife Fed'n,* No. 22-11173, 2023 WL 3186284, at *4 (E.D. Mich. May 1, 2023) (unpublished) ("In sum, the Amended Complaint sufficiently alleges that Defendant disclosed [private reading information] in violation of the [VRPA] as evidenced by that information being available for sale from NextMark during the relevant pre-July 31, 2016 period."); *Gottsleben v. Informa Media, Inc.*, No. 1:22-CV-866, 2023 WL 4397226, at *5 (W.D. Mich. July 7, 2023) (unpublished) (finding allegation that Defendant violated the VRPA plausible based, *inter alia*, on complaint's inclusion of NextMark datacard); *Briscoe v. NTVB Media Inc.*, No. 4:22-CV-10352, 2023 WL 2950623, at *7 (E.D. Mich. Mar. 3, 2023), *report and recommendation adopted as modified sub nom. Russett v. NTVB Media, Inc.*, No. 22-10352, 2023 WL 6315998 (E.D. Mich. Sept. 28, 2023) (unpublished) (same); *Piper v. Talbots, Inc.*, 507 F. Supp. 3d 339, 344 (D. Mass. 2020) (unpublished) (finding that plaintiff stated a claim under Virginia's Personal Information Privacy Act based on complaint's inclusion of NextMark data card)

rise to relief and easily satisfy the Rule 8 pleading standard.  Defendant's 12(b)(6) arguments are meritless, and the motion should be denied.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

Dated: July 1, 2024

Respectfully submitted,

PETERS | SCOFIELD
*A Professional Corporation*

/s/ David W. Scofield
DAVID W. SCOFIELD

-and-

**HEDIN HALL LLP**
Frank S. Hedin (Pro Hac Vice App. Forthcoming)

Attorneys for Plaintiff and the Putative Class